STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Brian HIBL, Defendant-Respondent.

Supreme Court

*No. 2004AP2936–CR. Oral argument April 5, 2006.*
*—Decided May 26, 2006.*

2006 WI 52

(Also reported in 714 N.W.2d 194.)

596

For the plaintiff-appellant-petitioner, the cause was argued by *Christopher G. Wren,* assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general.

For the defendant-respondent there was a brief by *Joel H. Rosenthal* and *Luck & Rosenthal, S.C.,* Milwaukee, and oral argument by *Joel H. Rosenthal.*

An amicus curiae brief was filed by *Keith A. Findley, John A. Pray, Byron C. Lichstein* and *University of Wisconsin Law School,* Madison, on behalf of the Wisconsin Innocence Project of the Frank J. Remington Center, University of Wisconsin Law School.

¶ 1. ANN WALSH BRADLEY, J. The State of Wisconsin petitions for review of a published court of

appeals' decision affirming the circuit court's order that suppressed the State's eyewitness identification evidence against the defendant, Brian Hibl.[1] The eyewitness, who was initially able to describe Hibl only as a "white male," identified Hibl 17 months later at the courthouse on the day that Hibl's case was scheduled for trial.

¶ 2. The State asserts that the court of appeals incorrectly applied *State v. Dubose,* 2005 WI 126, ¶ 16, 285 Wis. 2d 143, 699 N.W.2d 582, a case in which this court addressed a police "showup" procedure. It argues that the court of appeals should instead have applied *State v. Marshall,* 92 Wis. 2d 101, 284 N.W.2d 592 (1979), pertaining to "spontaneous" or "accidental" identifications.

¶ 3. We determine that *Dubose* does not directly control cases involving identification evidence derived from "accidental" confrontations resulting in "spontaneous" identifications. However, we further determine that in light of developments since the time of *Marshall,* including those recognized in *Dubose, Marshall* does not necessarily resolve all such cases. We conclude that the circuit court still has a limited gatekeeping function to exclude such evidence under Wis. Stat. § 904.03 (2003–04).[2] Accordingly, we reverse the court of appeals and remand to the circuit court for a determination of whether evidence of the identification of Hibl should be excluded under § 904.03.

---

[1] *See State v. Hibl,* 2005 WI App 228, 287 Wis. 2d 806, 706 N.W.2d 134 (affirming an order of the circuit court for Waukesha County, Paul F. Reilly, Judge).

[2] All subsequent references to the Wisconsin Statutes are to the 2003–04 version.

I

¶ 4. On the afternoon of June 25, 2002, a City of Muskego police officer was driving southbound on Racine Avenue. He noticed two northbound vehicles, a red pickup truck and a white van, that appeared to be exceeding the speed limit of 35 miles per hour. The two vehicles appeared to jockey for position as they traveled toward a portion of the road that narrows from two lanes to one.

¶ 5. After the vehicles passed him, the officer continued to watch them in his rear and side view mirrors, at which time he observed that the white van was ahead of the pickup truck. The truck then pulled into the southbound lane, apparently attempting to pass the van. The next thing he saw was that the pickup truck had collided with something. The white van did not stop and was not located.

¶ 6. Alan Stuller, who was also driving southbound on Racine Avenue, witnessed the accident. As he passed the two vehicles, he looked into his rear view mirror and saw the pickup truck pull completely into the southbound lane in order to pass the white van. While the truck was attempting to pass the van, the van was accelerating. Stuller then observed the pickup truck collide head-on with another southbound vehicle.

¶ 7. A police detective took a brief statement from Stuller at the scene and asked him to go to the police station to give a more complete statement. At that time, Stuller identified the van's driver as a white male but was unable to describe him in further detail. The police did not ask Stuller to make an identification of the van's driver using a photo array or a lineup procedure.

¶ 8. Two days after the accident, police were informed that Hibl reported witnessing the accident. A

600

detective interviewed Hibl, who stated that he had been driving a white van northbound on Racine Avenue at approximately the same time the accident occurred. At one point, Hibl admitted that he may have been a contributing factor.

¶ 9. The State charged Hibl with one count of causing great bodily harm to another by reckless driving contrary to Wis. Stat. § 346.62(4), and two counts of causing bodily harm to another by reckless driving contrary to § 346.62(3). The prosecutor advised defense counsel that there were no known witnesses who could identify Hibl as the driver of the white van. Similarly, defense counsel determined that the discovery documents received from the State did not contain any indication that there was a witness capable of identifying Hibl as the driver of the van.

¶ 10. Approximately three weeks to a month before the date set for Hibl's trial, Stuller received a subpoena to appear as a witness. On the day of trial, he arrived at the courthouse before the trial began. He was speaking with the prosecutor outside the courtroom in the hallway, when he looked up and recognized Hibl as the driver of the white van. The prosecutor informed defense counsel, who moved for a mistrial based upon the potential identification evidence that had come to light. The State joined in the motion, which the circuit court granted.

¶ 11. Hibl subsequently moved to suppress Stuller's pretrial identification, along with any in-court identification the State might seek to elicit. He asserted that the circumstances of the pretrial, hallway identification were impermissibly suggestive.

¶ 12. At the suppression hearing, Stuller testified that at the time of the accident, he was traveling at 35 or 40 miles per hour and that the white van and red

601

pickup truck were traveling approximately 60 miles per hour when he first saw them. The vehicles "had [his] attention from when they went by" because they were speeding. Stuller estimated that he first saw the driver of the van from about 50 feet away and that he had looked directly at the driver for three to five seconds. He could not remember whether the driver had glasses and could describe the driver only as a "white male." Stuller told an investigating officer that he was unable to provide any other description of the van driver, including height, weight, or age, and that he did not think he could make an identification.

¶ 13. Stuller also testified that between the time he received the subpoena and the trial date, he had no contact with police. He had one contact with the district attorney's office, in which the prosecutor advised him that they would meet at the courthouse to review his statement immediately before trial. Stuller admitted that he possessed some articles about the accident, but said that he did not read them and did not think that they contained any photographs.

¶ 14. Stuller further testified that on the day of trial he arrived at the courthouse and, without looking into the courtroom, sat down on a chair in what he described as the "waiting room." He had never been to the courthouse before, had never appeared as a witness before, and did not expect to see the same person that he had seen driving the white van on the date of the accident. While waiting outside the courtroom, he spoke briefly with a police officer, but not about the case. The prosecutor came out of the courtroom and walked with Stuller into the hallway to review his statement. Stuller could not recall whether the prosecutor asked him at that time if he could identify the driver of the white van. According to Stuller's testi-

mony, he did not see anyone else leave the courtroom, and he thought there were about 10 people in the hallway.

¶ 15. After talking with the prosecutor for approximately two or three minutes, Stuller "just turned to [his] left and . . . saw the defendant, Mr. Hibl," about ten feet away walking with someone. Although Hibl had glasses on, Stuller "knew [he] recognized [Hibl]" from "[h]is face in general. . . . It just—it—he stood out from everybody else in the hallway." Stuller told the prosecutor: "That's him."

¶ 16. A detective met separately with Stuller and the prosecutor immediately following the identification, and he also testified at the suppression hearing. He corroborated Stuller's testimony in some respects, but said that Stuller made the identification after seeing Hibl come out of the courtroom.

¶ 17. At the conclusion of the suppression hearing, the prosecutor gave a brief oral statement to the court in which he confirmed that he had telephoned Stuller to speak with him about his testimony. The prosecutor did not recall whether they discussed Stuller's ability to make an identification.

¶ 18. The circuit court applied *State v. Wolverton,* 193 Wis. 2d 234, 533 N.W.2d 167 (1995), a case involving the right to due process and identification evidence derived from a showup procedure conducted by police. Applying *Wolverton,* the court first determined that "Stuller's juxtaposition in the courtroom hallway with the ADA, anticipating the alleged defendant in court in a few minutes, constitutes an identification that occurred in an impermissibly suggestive manner." It found that there was no evidence that the police or district attorney's office intentionally or unintention-

603

ally suggested the identification. However, it also found that Stuller "knew he would see the alleged defendant."

¶ 19. Still following *Wolverton,* the circuit court then concluded that the State could not show the identification was reliable based on the totality of the facts: Stuller had observed the van's driver while traveling 35 to 40 miles per hour while the van was traveling toward him at a high rate of speed; on the day of the alleged offense Stuller could not identify the driver's facial features, height, and weight, or whether he wore glasses; Stuller could identify the driver that day only as a "white male"; and Stuller's identification of Hibl in the courtroom hallway occurred 15 months after he witnessed the accident.[3] The circuit court therefore suppressed Stuller's identification of Hibl.

¶ 20. The State appealed, and after the parties completed their appellate briefing but before the court of appeals issued an opinion, this court decided *Dubose.* In *Dubose* the court held based on the due process clause in the Wisconsin Constitution that evidence obtained from an out-of-court showup is inherently suggestive and will not be admissible unless, based on the totality of circumstances, the procedure was "necessary." *Dubose,* 285 Wis. 2d 143, ¶ 33. The court also withdrew certain language from *Wolverton. Id.,* ¶ 33 n.9.

¶ 21. In a split decision, the court of appeals affirmed the circuit court but employed a different analysis. The court of appeals majority determined that although *Dubose* addressed a police showup procedure, the concerns articulated in *Dubose* about misidentification are not limited to situations where police arranged

---

[3] Stuller's identification of Hibl actually occurred almost 17 months after the accident.

a confrontation. It further determined that principles of fairness dictate that identification evidence, even absent police involvement, must be scrutinized to determine whether suppression is required. After noting that evidence must be reliable enough to be probative, the court of appeals majority concluded that the circuit court's rationale was sound.

¶ 22. The dissent in the court of appeals determined that *Dubose* was limited to pretrial police showup procedures, thus leaving prevailing rules in place with respect to other pretrial identifications. It concluded that the prevailing rule relevant to Hibl's case was set forth in *Marshall,* a case in which this court determined that identification evidence need not be scrutinized for a due process violation unless the identification occurs as part of a police procedure directed toward obtaining identification evidence. *Marshall,* 92 Wis. 2d at 118. The State petitioned for review.

## II

■■■■

¶ 23. This case comes to us in the context of Hibl's suppression motion. When reviewing a motion to suppress, we uphold the circuit court's findings of fact unless they are clearly erroneous. *Dubose,* 285 Wis. 2d 143, ¶ 16. However, we independently review the circuit court's application of constitutional and other legal principles. *See id.*[4]

---

[4] Some of the circuit court's fact findings appear unsupported by the record unless the court implicitly found that portions of Stuller's testimony were not credible. Hibl makes arguments suggesting that the circuit made such an implicit finding. We need not address whether any of the circuit court's fact findings are clearly erroneous. Hibl conceded at oral

¶ 24. The framework for analyzing showups, as set forth in both *Wolverton* and previous cases, springs from the due process clause in the federal constitution as interpreted by the United States Supreme Court in a series of decisions culminating in *Manson v. Brathwaite,* 432 U.S. 98 (1977).[5] In *Brathwaite,* the Court stated what has become an oft-stated maxim,[6] that "reliability is the linchpin in determining the admissibility of identification testimony." *Brathwaite,* 432 U.S. at 114; *see also Neil v. Biggers,* 409 U.S. 188, 198 (1972) ("[i]t is the likelihood of misidentification which violates a defendant's right to due process").

¶ 25. Under *Wolverton,* courts were to use a two-step test to determine whether a showup must be suppressed to avoid a due process violation. The defen-

argument that the record supports the circuit court's finding that the police and district attorney did not intentionally suggest the identification. Indeed, the record before us would not have supported a finding that the identification in this case involved any law enforcement procedure directed at obtaining identification evidence. These are the key facts for our purposes here. On remand, the circuit court and parties may seek to clarify other fact findings if necessary.

[5] *See Neil v. Biggers,* 409 U.S. 188 (1972); *Simmons v. United States,* 390 U.S. 377 (1968); *Stovall v. Denno,* 388 U.S. 293 (1967); *Gilbert v. California,* 388 U.S. 263 (1967); *United States v. Wade,* 388 U.S. 218 (1967).

[6] *See, e.g., McFowler v. Jaimet,* 349 F.3d 436, 449 (7th Cir. 2003); *State v. Dubose,* 2005 WI 126, ¶ 25, 285 Wis. 2d 143, 699 N.W.2d 582; *State v. Streich,* 87 Wis. 2d 209, 215, 274 N.W.2d 635 (1979); *Simos v. State,* 83 Wis. 2d 251, 255, 265 N.W.2d 278 (1978); *State v. Thornton,* 506 N.W.2d 777, 779 (Iowa 1993); *State v. Faust,* 696 N.W.2d 420, 427 (Neb. 2005); *State v. Norrid,* 611 N.W.2d 866, 871 (N.D. 2000); *State v. Jells,* 559 N.E.2d 464, 470 (Ohio 1990).

dant bore the initial burden of demonstrating that an identification procedure was impermissibly suggestive. *Wolverton,* 193 Wis. 2d at 264. If that burden was met, the State had to show that the identification was reliable under the totality of the circumstances even though the procedure was suggestive. *Id.* As already noted, the circuit court here applied this two-step test.

**■**

¶ 26. Last term, in *Dubose,* when this court held that evidence obtained from an out-of-court showup will not be admissible unless the procedure was "necessary," it based its decision on the due process clause in the Wisconsin Constitution. It withdrew language from *Wolverton* and other cases that could be construed to the contrary. *Dubose,* 285 Wis. 2d 143, ¶ 33 & n.9. Under *Dubose,* identification evidence resulting from an "unnecessary" showup is suppressed as inherently too suggestive, without any separate fact-based inquiry into suggestiveness or reliability.

¶ 27. *Dubose* and *Wolverton* involved similar showup procedures. In both cases, police exhibited a suspect to one or more eyewitnesses while the suspect was sitting alone in a police car. *Dubose,* 285 Wis. 2d 143, ¶¶ 8–9; *Wolverton,* 193 Wis. 2d at 246, 249, 265–68.

¶ 28. In *Marshall,* decided over 25 years ago, the court addressed a different type of identification scenario that is more akin to what occurred here. Specifically, in *Marshall* the identification occurred when a witness spotted the defendant sitting a few rows in front of him in the courtroom. *Marshall,* 92 Wis. 2d at 109. The record showed that the identification of the defendant "was not pre-arranged and was as much a surprise to the State as it was to the defendant." *Id.* at 118.

¶ 29. The court began by citing the two-step due process test, but then, without citation, qualified the

scope of the test's applicability: "[I]t must first be determined whether the confrontation was deliberately contrived by the police for purposes of obtaining an eyewitness identification of the defendant." *Id.* at 117. The court ultimately concluded that the test does not apply when "the confrontation is not part of a police procedure directed toward obtaining additional evidence, but occurs as a result of mere chance or for some other reason not related to the identification of the defendant." *Id.* at 118.[7]

## IV

¶ 30. The State asserts that when the court of appeals affirmed the circuit court, it erroneously applied *Dubose* and should have applied *Marshall* instead. It argues that Stuller's "spontaneous" or "accidental" identification falls squarely within the confines of *Marshall*.

¶ 31. For the reasons stated below, we determine that *Dubose* does not directly control cases involving evidence derived from "accidental" confrontations resulting in "spontaneous" identifications. However, we further determine that in light of developments since the time of *Marshall,* including those recognized in *Dubose, Marshall* does not necessarily resolve all such

---

[7] In other cases that pre-date *State v. Marshall,* 92 Wis. 2d 101, 284 N.W.2d 592 (1979), and that also involved accidental confrontations, the court seemed to apply the due process framework without the qualification of a police procedure. *See Jones v. State,* 63 Wis. 2d 97, 107–09, 216 N.W.2d 224 (1974); *State v. Brown,* 50 Wis. 2d 565, 570–71, 185 N.W.2d 232 (1971), *overruled in part by State v. Walker,* 154 Wis. 2d 158, 186, 453 N.W.2d 127 (1990). Somewhat curiously, the court in *Marshall* nonetheless analogized its conclusion to the *Jones* and *Brown* cases. *See Marshall,* 92 Wis. 2d at 118.

608

cases. Although most such identifications will be for the jury to assess, the circuit court still has a limited gate-keeping function. It may exclude such evidence under § 904.03 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[8]

## A

¶ 32. *Dubose* is not directly controlling. Although the court in *Dubose* relied, in part, on research that potentially implicates all eyewitness identifications, the court's holding was more circumspect. Specifically, the court "adopt[ed] a different test in Wisconsin regarding the admissibility of *showup* identifications." *Dubose,* 285 Wis. 2d 143, ¶ 33 (emphasis added). It held that "evidence obtained from such a *showup* will not be admissible unless, based on the totality of the circumstances, the *showup* was *necessary.*" *Id.,* ¶¶ 2, 45 (emphasis added).

¶ 33. The term "showup" itself denotes a police procedure. The court in *Dubose* used the following definition of showup: "an out-of-court pretrial identification *procedure* in which a suspect *is presented* singly to a witness *for identification purposes.*" *Dubose,* 285 Wis. 2d 143, ¶ 1 n.1 (emphasis added; quoting *Wolverton,* 193 Wis. 2d at 263 n.21).

---

[8] Wisconsin Stat. § 904.03 reads, in full, as follows:

Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

¶ 34. Moreover, the court's characterization of what constitutes a "necessary" showup reinforces the notion that the court did not intend that *Dubose* necessarily control identifications that do not involve a law enforcement procedure. Under *Dubose,* a showup is "necessary" only if "police lacked probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array." *Id.,* ¶¶ 2, 45.

¶ 35. Thus, *Dubose* does not directly control Hibl's case, which does not involve a "showup" as this court has defined the term. That said, the *Dubose* focus on one type of inherently suggestive police procedure does not mean that courts must ignore the potential for unreliability in all other types of eyewitness identifications. Here, the question becomes how to address the potential for unreliability in the context of an apparently "accidental" confrontation that results in a "spontaneous" identification. Although *Dubose* is not directly controlling, aspects of *Dubose* will inform the answer.

B

¶ 36. Having determined that *Dubose* is not directly controlling, we turn to *Marshall.* At first, it might appear that *Marshall* provides not only the starting point but also the ending point for "spontaneous" identifications resulting from "accidental" confrontations. Given developments since the time of *Marshall,* however, we take this opportunity to re-examine *Marshall.*

¶ 37. Since the time this court decided *Marshall,* over 25 years ago, concerns with the reliability of eyewitness testimony have come to the fore. In *Dubose,*

the court recognized that "much new information has been assembled" and that recent studies confirm that eyewitness testimony is "often 'hopelessly unreliable.' " *Dubose*, 285 Wis. 2d 143, ¶¶ 29–30. The court explained that "research strongly supports the conclusion that eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and responsible for more wrongful convictions than all other causes combined." *Id.*, ¶ 30. Earlier this term, the court similarly acknowledged its "growing appreciation for the difficulties inherent in eyewitness identification." *State v. Shomberg*, 2006 WI 9, ¶ 43, 288 Wis. 2d 1, 709 N.W.2d 370.

¶ 38. Of course, some phenomena affecting the reliability of eyewitness identifications have long been recognized. For example, the United States Supreme Court observed almost 30 years ago in *Brathwaite* that a witness's "recollection of the stranger can be distorted easily by the circumstances or by later actions of the police." *Brathwaite*, 432 U.S. at 112.

¶ 39. Courts have traditionally employed several factors to assess reliability, based on common sense notions of human perception and memory. Those factors are the ones recited in *Wolverton* that the circuit court applied here: the opportunity of the witness to view the criminal at the time of the crime; the witness's degree of attention; the accuracy of the witness's prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199–200.

¶ 40. More recently, other phenomena that may affect the reliability of eyewitness identifications have been widely proffered or recognized. These phenomena may not be within the common knowledge of many

jurors or judges. They include the "relative judgment" process;[9] the stressfulness of the event for the eyewitness;[10] whether the event involved "weapon focus";[11] the cross-racial nature of an identification;[12] and whether an eyewitness is given positive feedback during or immediately following the identification.[13]

¶ 41. Many of the phenomena said to affect the reliability of eyewitness identification are the subject of ongoing debate.[14] One thing not subject to debate is

[9] *See State v. Shomberg,* 2006 WI 9, ¶ 28, ¶ 49 (Abrahamson, C.J., dissenting), 288 Wis. 2d 1, 709 N.W.2d 370; State of Wisconsin, Office of the Attorney General, *Model Policy and Procedure for Eyewitness Identification* (Sept. 12, 2005) at p. 2 (footnotes omitted). The "relative judgment" process refers to "the tendency when viewing a simultaneous presentation (viewing an entire photo array or lineup at once) for eyewitnesses to identify the person who looks the most like the real perpetrator relative to the other people." *Model Policy and Procedure,* at 2.

[10] *See United States v. Sebetich,* 776 F.2d 412, 419 (3d Cir. 1985); *see also Shomberg,* 2006 WI 9, ¶ 70 (Butler, J., dissenting).

[11] *Shomberg,* 2006 WI 9, ¶ 70 (Butler, J., dissenting).

[12] *See State v. McMorris,* 213 Wis. 2d 156, 170 n.9, 570 N.W.2d 384 (1997).

[13] *Shomberg,* 2006 WI 9, ¶ 71 (Butler, J., dissenting).

[14] There is also debate over the traditional factors from *Biggers.* At least one of those factors, eyewitness certainty in the identification, has come under serious attack. The Wisconsin Innocence Project, amicus in this case, provided a copy of an amicus brief recently submitted to the United States Supreme Court in *Ledbetter v. Connecticut,* No. 05–9500, on behalf of numerous university professors who hold themselves out as experts in the field. They assert that the certainty factor has no scientific basis. In support of this assertion, they engage in an extensive review of research suggesting that the relationship between eyewitness certainty and eyewitness accuracy is gen-

that even *un*intentional suggestiveness can become a key factor in identification errors. *See* State of Wisconsin, Office of the Attorney General, *Model Policy and Procedure for Eyewitness Identification* (Sept. 12, 2005) at p. 2 (emphasis added). What is important for our examination here is that many of these phenomena do not depend on the presence of a law enforcement procedure. To the extent that identification evidence is extremely unreliable based on such phenomena, independent of any law enforcement procedure, *Marshall*'s holding may need to be modified.

¶ 42. Courts since the time of *Marshall* have not uniformly followed its approach. Some jurisdictions have taken approaches consistent with *Marshall. See State v. Bertram,* 591 A.2d 14, 25–27 (R.I. 1991); *State v. Naoum,* 548 A.2d 120, 124–25 (Me. 1988); *State v. Brown,* 528 N.E.2d 523, 533 (Ohio 1988); *Wilson v. Commonwealth,* 695 S.W.2d 854, 857 (Ky. 1985) ("in order to establish that a pre-trial confrontation was unduly suggestive, the defendant must first show that the government's agents arranged the confrontation or took some action during the confrontation which singled out the defendant").

¶ 43. Others have not. *United States v. Bouthot,* 878 F.2d 1506, 1513–16 (1st Cir. 1989) ("[b]ecause the due process focus in the identification context is on the fairness of the trial and not exclusively on police deterrence, it follows that federal courts should scrutinize all suggestive identification procedures, not just those orchestrated by the police"); *Thigpen v. Cory,* 804 F.2d 893, 895–97 (6th Cir. 1986); *Green v. Loggins,* 614 F.2d 219, 223 (9th Cir. 1980) ("a court is obligated to

erally weak and easily subject to corruption. The State maintains, however, that research shows certainty remains a reliable predictor of accuracy.

review every pre-trial encounter, accidental or otherwise, in order to insure that the circumstances of the particular encounter have not been so suggestive as to undermine the reliability of the witness' subsequent identification"); *see also State v. Holliman,* 570 A.2d 680, 684 (Conn. 1990) (applying the two-step test to an identification resulting purely from private citizen action, and holding that the criteria determining the admissibility of identifications for purposes of due process should apply "even if the defendant's claim has no constitutional underpinning").

¶ 44. Professor LaFave, discussing what he terms the "so-called 'accidental' showup," is critical of the *Marshall* approach:

> [T]he mere fact that the confrontation was not deliberate does not mean that it was necessary: doubtless many of these "accidents" could be prevented by more careful procedures concerning the movement of prisoners. Moreover, because "the due process focus in the identification context is on the fairness of the trial and not exclusively on police deterrence," courts "should scrutinize all suggestive identification procedures, not just those orchestrated by the police, to determine if they would sufficiently taint the trial so as to deprive the defendant of due process."

Wayne R. LaFave, Jerold H. Israel, & Nancy J. King, 2 *Criminal Procedure* § 7.4(b), at 670–71 (1999) (footnotes omitted).

¶ 45. To the extent that we can generalize from the authorities cited, little more can be said than this: the approach the court took in *Marshall* has not become a prevailing, well-settled, or generally-accepted rule across jurisdictions.

¶ 46. In light of all of the developments since the time of *Marshall,* we make the unremarkable observa-

tion that in some future case presenting different circumstances *Marshall* may need to be modified. There may be some conceivable set of circumstances under which the admission of highly unreliable identification evidence could violate a defendant's right to due process, even though a state-constructed identification procedure is absent.

¶ 47. Based on the record before us, however, we are not prepared to declare that the admission of the identification evidence in this case would violate Hibl's right to due process. The circumstances of Stuller's identification of Hibl in the courthouse hallway are not sufficiently suggestive. Thus, we need not and do not modify *Marshall* at this time. Nonetheless, our inquiry is not at an end. *Marshall* did not address, and therefore does not preclude, circuit court scrutiny of eyewitness identification evidence for admissibility under the rules of evidence.

C

■

¶ 48. The *Marshall* focus on a state-constructed procedure for a due process violation does not mean that courts must always ignore the circumstances of an identification and assume there is sufficient reliability absent a police procedure. Regardless of whether law enforcement officers have used a procedure directed at obtaining identification evidence, circuit courts still have the authority and the responsibility to serve a limited gate-keeping function. They still have the discretion to exclude relevant evidence under § 904.03 if it is "so unreliable that its probative value is substantially outweighed by the danger of prejudice and confusion." *Boyer v. State,* 91 Wis. 2d 647, 663, 284 N.W.2d 30

(1979); *cf. State v. Moss,* 2003 WI App 239, ¶ 21, 267 Wis. 2d 772, 672 N.W.2d 125 (confession coerced by a private citizen could be excluded as unreliable on evidentiary grounds, including § 904.03, even though it was not subject to challenge on due process grounds).

¶ 49. Traditionally, eyewitness identification evidence has been thought to involve a credibility determination solely for the jury. As the Supreme Court explained in *Stovall v. Denno,* 388 U.S. 293, 299–300 (1967), "[t]he overwhelming majority of American courts have always treated the evidence question not as one of admissibility but as one of credibility for the jury." In *Brathwaite,* however, the court observed that "[*United States v.*] *Wade*[, 388 U.S. 218 (1967)] and its companion cases" (one of which is *Stovall*) "reflect the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability." *Brathwaite,* 432 U.S. at 112.

¶ 50. Despite the right to a trial by jury, the law permits and sometimes requires that a trial court keep evidence from the jury. Although some rules of admissibility, such as those in *Brathwaite* or *Dubose,* are based on constitutional considerations, others, such as § 904.03, are founded on common law or statute. Thus, "neither constitutional considerations nor the presence of State action (besides the use of the evidence itself) are essential preconditions for a determination that certain relevant evidence should be kept from the trier of fact." *Commonwealth v. Jones,* 666 N.E.2d 994, 1000 (Mass. 1996).

¶ 51. At oral argument, the parties agreed that § 904.03 has a role to play in the context of the reliability of eyewitness identification evidence. The State conceded that unfair prejudice could be the con-

sequence of extreme unreliability and stated it was not disputing that unreliability could be an ingredient in the application of § 904.03. Similarly, when Hibl was asked his position on a circuit court's use of § 904.03 to exclude eyewitness identification evidence as unreliable, he responded "I agree with that."

¶ 52. That circuit courts serve a limited gate-keeping function, even for constitutionally admissible eyewitness identification evidence, comports with the maxim that "reliability is the linchpin in determining the admissibility of identification testimony." *Brathwaite*, 432 U.S. at 114; *cf. State v. Walstad*, 119 Wis. 2d 483, 519, 351 N.W.2d 469 (1984) (scientific expert testimony must be "reliable enough to be probative") (quoting *State v. Catanese*, 368 So.2d 975, 979 (La. 1979)).

¶ 53. We emphasize that in most instances, questions as to the reliability of constitutionally admissible eyewitness identification evidence will remain for the jury to answer. Generally we are "content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill." *Brathwaite*, 432 U.S. at 116. Juries can often "measure intelligently the weight of identification testimony that has some questionable feature." *Id.* At the same time, however, the circuit court's gate-keeping function should not be abdicated.

[11]

¶ 54. In exercising its gate-keeping function, the court should consider whether cross-examination or a jury instruction will fairly protect the defendant from the unreliability of the identification. The court may take a number of other factors into consideration,

including those we have articulated in ¶¶ 38–40, if appropriate, but litigants and trial courts should not be bound to an inflexible list of factors. We urge circuit courts, with assistance from the litigants before them, to take into consideration the evolving body of law on eyewitness identification. Any tests for reliability and suggestiveness in the eyewitness identification context should accommodate this still-evolving jurisprudence, along with the developing scientific research that forms some of its underpinnings.

¶ 55. In this case, neither the circuit court nor the court of appeals majority addressed *Marshall*. The circuit court applied *Wolverton* and did not apply § 904.03. Accordingly, we reverse the court of appeals and remand for the circuit court to make a determination of whether Stuller's identification of Hibl should be excluded pursuant to § 904.03. On remand, the circuit court may or may not determine that § 904.03 requires the exclusion of this identification evidence.

V

¶ 56. In sum, we determine that *Dubose* does not directly control cases involving evidence derived from "accidental" confrontations resulting in "spontaneous" identifications. However, we further determine that in light of developments since the time of *Marshall,* including those recognized in *Dubose, Marshall* does not necessarily resolve all such cases. The circuit court still has a limited gate-keeping function to exclude such evidence under § 904.03. We reverse the court of appeals and remand to the circuit court for a determination of whether the identification evidence in this case should be excluded under § 904.03.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 57. LOUIS B. BUTLER, JR., J. (*concurring*). My understanding of the majority's opinion in this matter is that because the admission of the identification evidence in this case would not violate the defendant Hibl's right to due process, we need not and do not modify at this time this court's earlier decision in *State v. Marshall,* 92 Wis. 2d 101, 118, 284 N.W.2d 592 (1979). Majority op., ¶ 47. With that caveat, I join all but paragraph 46 of the majority's opinion.