PER CURIAM.
¶ 1 In this interlocutory appeal, the State argues that the circuit court, prior to trial, improperly suppressed evidence that a shooting victim identified a photo of defendant Roberson as the shooter. The State also argues that the circuit court relied on the taint of the pretrial identification using the photo to additionally and erroneously rule that the victim would not be allowed to identify Roberson in court. We agree with the State that these suppression rulings were in error. Accordingly, we reverse and remand for further proceedings.
Background
¶ 2 Roberson was charged with first-degree reckless injury, as a repeater. The charge arose out of a shooting incident. The shooting victim, C.A.S., was approached at a Walmart store by a stranger, a man C.A.S. came to know as "P." P expressed interest in obtaining marijuana from C.A.S. C.A.S. and P left the store together in P's car, and C.A.S. helped P obtain marijuana. For reasons that will become apparent in the discussion section, it is significant that C.A.S. is white and P is black.
¶ 3 Over the next few days, C.A.S. and P had at least two more in-person contacts involving the purchase of marijuana. The relationship did not end well. Just prior to the last encounter between the two men, C.A.S. was robbed of marijuana that P had directed C.A.S. to sell on P's behalf. When C.A.S. reported to P that C.A.S. had been robbed, P picked up C.A.S. using P's car, drove C.A.S. to a different location, parked, and then fired a small caliber gun past C.A.S.'s head. An altercation ensued during which P shot C.A.S. in the leg.
¶ 4 C.A.S., who was on probation at the time, did not report the shooting to authorities. A police detective learned of the shooting through a confidential informant. About two weeks after the shooting, and after C.A.S. had been picked up and jailed, the detective and his partner interviewed C.A.S. about the shooting.
¶ 5 By the time of the interview, it appears that police had significant evidence indicating that the man whom C.A.S. knew as P was Roberson. What this other evidence is does not matter for purposes of this opinion. What matters is that, during the interview, the police officers already believed that they had identified Roberson as the shooter. Consequently, with the limited exception of clothing worn by the shooter at the time of the incident, the officers did not ask C.A.S. questions about the shooter's appearance and they did not attempt to conduct a non-suggestive identification procedure. Instead, using a cell phone, the officers simply showed C.A.S. a single color photo of Roberson from Roberson's Facebook account, after effectively communicating to C.A.S. that they believed the person in the photo was the shooter.
¶ 6 Roberson moved to suppress C.A.S.'s pretrial identification of Roberson, based on the fact that police used a single photo instead of a non-suggestive photo array. An evidentiary hearing was held at which C.A.S. and the primary questioning detective testified. The circuit court granted Roberson's suppression motion. The circuit court concluded that evidence of C.A.S.'s photo identification of Roberson was inadmissible and that C.A.S. would not be allowed to identify Roberson in court.
¶ 7 The State filed this interlocutory appeal.
Discussion
A. Introduction
¶ 8 As noted, the parties dispute whether the circuit court properly suppressed evidence of C.A.S.'s identification of a photo of defendant Roberson and also whether the circuit court properly ruled that C.A.S. would not be allowed to identify Roberson in court. In this opinion, our discussion explains why the photo identification evidence is admissible. We do not separately discuss the circuit court's decision to prohibit C.A.S. from identifying Roberson in court. We perceive no dispute that the circuit court's ruling prohibiting an in-court identification is based solely on its determination that the use of the photo identification evidence tainted the pretrial identification. It follows that our disagreement with the circuit court's analysis of the photo identification evidence dictates reversal of the court's in-court identification ruling.
B. General Standard of Review
¶ 9 We employ a two-step analysis to our review of suppression rulings:
First, we review the circuit court's findings of fact. We will uphold these findings unless they are against the great weight and clear preponderance of the evidence. "In reviewing an order suppressing evidence, appellate courts will uphold findings of evidentiary or historical fact unless they are clearly erroneous." Next, we must review independently the application of relevant constitutional principles to those facts. Such a review presents a question of law, which we review de novo, but with the benefit of analyses of the circuit court and court of appeals.
State v. Dubose , 2005 WI 126, ¶ 16, 285 Wis. 2d 143, 699 N.W.2d 582 (citations omitted).
C. Applicability of the Dubose "Necessity" Standard
¶ 10 The parties dispute whether the legal analysis we should apply to the single-photo identification procedure in this case is the long-standing suggestiveness/reliability test set forth in cases such as Neil v. Biggers , 409 U.S. 188, 198-200 (1972), and Powell v. State , 86 Wis. 2d 51, 64-65, 271 N.W.2d 610 (1978), or instead the "necessity" standard adopted in Dubose , 285 Wis. 2d 143, ¶ 45. In particular, the parties dispute whether we held in State v. Drew , 2007 WI App 213, 305 Wis. 2d 641, 740 N.W.2d 404, that the Dubose necessity standard does not apply to photo identification procedures because Dubose applies only to "showups."
¶ 11 We perceive the question at hand as having two parts. First, whether a "showup" includes showing a single photograph to a witness. Second, whether, even if the display of a single photograph is not a "showup," we are at liberty to hold that the Dubose necessity standard should be extended to single photo identification procedures. We conclude that we need not address our Drew decision because supreme court case law makes clear that a single photo identification procedure is not a "showup." As to the second question, if Roberson means to make that argument, we conclude that any decision to extend the Dubose necessity standard should be left to our supreme court.[1]
¶ 12 As to whether a "showup" includes showing a single photograph to a witness, Dubose itself clearly uses the term "showup" to refer to an in-person identification procedure. Dubose looks to the definition of "showup" found in prior case law. Quoting State v. Wolverton , 193 Wis. 2d 234, 263 n.21, 533 N.W.2d 167 (1995), the Dubose court wrote: " 'A "showup" is an out-of-court pretrial identification procedure in which a suspect is presented singly to a witness for identification purposes.' " Dubose , 285 Wis. 2d 143, ¶ 1 n.1.
¶ 13 More tellingly, the Dubose court twice distinguished a "showup" from showing a witness a single photograph. In the factual background, the Dubose court wrote:
[T]he officers conducted a showup procedure, giving [the crime victim] the opportunity to identify one of the alleged suspects. The officers placed [the victim] in the backseat of a second squad car, which was parked so that its rear window was three feet apart from the rear window of the squad car containing Dubose. The dome light was turned on in the car containing Dubose.... [The victim] told the police that he was 98 percent certain that Dubose, who sat alone in the back seat of the other squad car, was the man who held him at gunpoint....
... Approximately 10 to 15 minutes after the first showup, the police conducted a second showup . There, [the victim] identified Dubose, alone in a room, through a two-way mirror. [The victim] told police that Dubose was the same man he observed at the previous showup, and that he believed Dubose was the man who robbed him. A short time after the second showup, the police showed [the victim] a mug shot of Dubose, and he identified him for a third time.
Id. , ¶¶ 9-10 (emphasis added). In its analysis, the Dubose court wrote:
While our focus is on the two showups that occurred here, the photo identification by showing [the victim] a mug shot of Dubose, was also unnecessarily suggestive and that out-of-court identification should have been suppressed.
Id. , ¶ 37.
¶ 14 Any doubt that might remain was put to rest in State v. Ziegler , 2012 WI 73, ¶ 78 n.13, 342 Wis. 2d 256, 816 N.W.2d 238, where our supreme court wrote that a " 'showup' is '[a] pretrial identification procedure in which a suspect is confronted with a witness to or the victim of a crime.' 'Unlike a lineup, a showup is a one-on-one confrontation.' " (Citation omitted.) Obviously, confronting a suspect with a witness does not describe showing a photo of a suspect to a witness. Additionally, a "one-on-one confrontation " does not describe the interplay of a photo and a witness.
¶ 15 Roberson essentially argues that the danger of misidentification posed by a single photo identification procedure is similar to the danger of misidentification involved in a showup. We do not address the merits of that argument. Our point here is that our case law dictates that a single photo identification procedure is not a "showup."
¶ 16 Roberson may additionally be arguing that, even if the identification procedure used here was not a "showup," we should nonetheless extend the Dubose necessity rule to single photo identifications. If Roberson means to make this argument, we decline to entertain it. Our supreme court has indicated in State v. Luedtke , 2015 WI 42, 362 Wis. 2d 1, 863 N.W.2d 592, that it is not interested in extending the Dubose due process analysis to situations beyond showups.
¶ 17 More specifically, in Luedtke the court declined to apply Dubose 's "broader due process right" analysis to defendant rights implicated when the State Crime Laboratory tests and destroys blood samples before a defendant had an opportunity to test the samples. See Luedtke , 362 Wis. 2d 1, ¶¶ 6, 47-48. Pertinent here, the Luedtke court stated that in Dubose it had "restricted [the] broader [due process] right to the specific context of an identification procedure known as a 'showup.' " Luedtke , 362 Wis. 2d 1, ¶ 48 (emphasis added). We glean from Luedtke that we should leave to the supreme court whether to extend the Dubose approach to situations beyond showups.
D. Reliability Under the Totality of the Circumstances Analysis
¶ 18 Although the State argues that the single photo identification procedure was not impermissibly suggestive, we will assume for purposes of this opinion that the procedure was sufficiently suggestive to shift the burden to the State. Under this circumstance, the State has the burden of demonstrating that the identification was nonetheless reliable. See Biggers , 409 U.S. at 199. The question is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Id. ; see also Powell , 86 Wis. 2d at 64-65 (explaining that Wisconsin follows the Biggers approach).
¶ 19 The Biggers Court explained that factors to be considered in evaluating reliability under the totality of the circumstances include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." See Biggers , 409 U.S. at 199. To this list, and pertinent here, our supreme court has added "the cross-racial nature of an identification." See State v. Hibl , 2006 WI 52, ¶ 40, 290 Wis. 2d 595, 714 N.W.2d 194.
¶ 20 We apply these factors, keeping in mind our supreme court's caution that:
in most instances, questions as to the reliability of constitutionally admissible eyewitness identification evidence will remain for the jury to answer. Generally we are "content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill." Juries can often "measure intelligently the weight of identification testimony that has some questionable feature."
Id. , ¶ 53 (citations omitted).
¶ 21 We now proceed to apply this analysis, beginning with a brief discussion of suggestiveness and a factual issue regarding suggestiveness raised by the State.
E. Suggestiveness of the Photo Identification Procedure Used Here
¶ 22 As noted, we assume, for purposes of this opinion, that the single photo identification procedure used here was sufficiently suggestive that it triggers a totality of the circumstances/reliability analysis. However, before proceeding to that analysis, we address a finding of fact made by the circuit court and challenged by the State. We agree with the State that the finding is partly erroneous, but we also conclude that the difference between the circuit court's mistaken belief and what actually happened is inconsequential.
¶ 23 While reciting facts in its written decision, the circuit court, referring to the photo shown to C.A.S., stated: "The Detective told [C.A.S.] it was a photo of Stephen I. Roberson and that they believed that was the person who shot him. [C.A.S.] didn't know who that person was." The State acknowledges that this summary of the part of the exchange preceding the display of the photo to C.A.S. is consistent with C.A.S.'s suppression hearing testimony. But the State argues that the summary is inconsistent with the video that shows with certainty what happened.
¶ 24 We agree with the State that the video unequivocally demonstrates that the officers neither told C.A.S. Roberson's name before showing C.A.S. Roberson's photo nor expressly stated that they believed Roberson was the shooter. Rather, the officers consistently referred to the shooter as "P." The video shows that there was no mention of Roberson's name prior to or at the time the officers showed C.A.S. a photo of Roberson.
¶ 25 However, the fact that the officers did not use Roberson's name or expressly state that they believed Roberson was the shooter is not significant because the officers otherwise plainly communicated to C.A.S. that they believed the single photo shown to C.A.S. was a photo of the man C.A.S. knew as "P." As the State accurately recounts, the video shows that one of the officers asked C.A.S.: "If you saw him again would you recognize him?" The "him" in this question was a clear reference to "P." After C.A.S. responds: "Possibly ... [unintelligible] ... I mean black people kind of look ... [unintelligible]," the officer asks the other officer if he has "that picture for [C.A.S.]," and the other officer responds by showing C.A.S. a photo of Roberson.
¶ 26 The relevant portion of the video reveals that a reasonable person in C.A.S.'s position would have understood that the officers believed they were presenting a photo of the man whom the officers believed either was or likely was "P." Thus, although the officers did not tell C.A.S. Roberson's name or expressly state that they believed Roberson was P, the circuit court essentially got this factual matter right. That is, the officers communicated to C.A.S. that they were showing C.A.S. a picture of the person whom the officers believed was P.
F. Application of the Totality of the Circumstances/Reliability Test
¶ 27 Based on the non-exclusive list of factors identified in Biggers and Hibl , and in light of the parties' arguments, we organize our reliability discussion around the following topics:
• The opportunity of C.A.S. to view the shooter before and at the time of the shooting.
• C.A.S.'s degree of attention.
• The accuracy of C.A.S.'s prior description of the shooter.
• The level of certainty demonstrated by C.A.S. during the identification procedure.
• The length of time between the shooting and the identification procedure.
• Cross-racial identification-C.A.S.'s ability to differentiate a black person that C.A.S. has had contact with from other black people.
For the most part, we address each factor separately below and then conclude that, taken together, they demonstrate that the photo identification was reliable enough to be presented to a jury.
1. Opportunity of C.A.S. to View P Before and At the Time of the Shooting
¶ 28 C.A.S.'s first encounter with P occurred at a Walmart store. P tapped C.A.S. on the shoulder and asked C.A.S. if he "smoked." C.A.S. responded that he did. P asked C.A.S. if C.A.S. could get a "bag of weed." Again C.A.S. replied in the affirmative. C.A.S. and P then left the store and walked to P's car, described by C.A.S. as a "tannish" or "gold" Buick. P drove C.A.S. to a location where C.A.S. obtained marijuana. P then drove C.A.S. back to the Walmart store. Once there, C.A.S. gave P his phone number. C.A.S. estimated that this first encounter lasted a little longer than half an hour.
¶ 29 The next day, C.A.S. had contact with P regarding further marijuana purchases. Although there is evidence suggesting that this contact was in-person and lasted about half an hour, we will assume for purposes of this opinion that on this day C.A.S. had contact with P only by voice or by texting using a phone. We make this assumption because we conclude that the evidence on this topic is ambiguous. What is clear from the evidence is that the two men had additional and substantial face-to-face contact.
¶ 30 Two days after the initial encounter that began at the Walmart store, C.A.S. apparently communicated by phone to P that C.A.S. knew where to obtain more marijuana. That evening, P went to a house where C.A.S. was staying. C.A.S.'s brother and sister were present. After an unspecified amount of time, P drove C.A.S. and C.A.S.'s brother and sister to a location where P paid more than $500 in cash for marijuana. P then drove the group back to the house where he had picked them up and P entered the house with C.A.S. While inside the house, P weighed the marijuana. P asked C.A.S. "to sell [the marijuana] for him; ... to sell it in eighths." C.A.S. informed P that he knew someone who would purchase "a half ounce." C.A.S. asserted that this second encounter lasted a little longer than half an hour.
¶ 31 C.A.S. and P parted company, and C.A.S. attempted to sell the marijuana to a "guy named Taylor." However, instead of purchasing the marijuana, the man C.A.S. identified as "Taylor" pulled out a gun and took the marijuana from C.A.S. C.A.S. then called or texted P telling P about the robbery.
¶ 32 C.A.S. and P then had what was, at a minimum, their third in-person encounter. P picked up C.A.S. and they drove toward a dog park. P pulled a "gun, a little 22 or 25" and "fired past [C.A.S.'s] head." C.A.S. then punched P and the two men struggled. P shot C.A.S. in the leg. P asked C.A.S. if C.A.S. was going to tell anyone about the shooting. C.A.S. replied, "no," and asked P to take him "home." P drove C.A.S. to a house and dropped him off.[2]
¶ 33 We conclude that these undisputed facts show that C.A.S. had substantial opportunities to view P's appearance during each of three separate encounters. Contrary to Roberson's assertion that "it appears [during] the bulk of the [time C.A.S. spent with P] CAS was a front-facing passenger in a car driven by P [and, therefore,] it is unlikely CAS was acquainted enough with P's personal facial characteristics to make an accurate identification," the evidence shows that C.A.S. spent substantial time with P apart from riding in a car together.
2. C.A.S.'s Degree of Attention
¶ 34 The circuit court's full degree-of-attention analysis is as follows:
[C.A.S.]'s degree of attention is difficult to pinpoint. On the one hand, it is likely [C.A.S.] was paying attention to the person in this physical confrontation who shot him. However, it is also likely that [C.A.S.] was paying attention to the gun and the situation, as well as the robbery that had recently occurred to him....
... This Court believes [C.A.S.] has a sufficient basis to identify "P" from those meetings.
This discussion mistakenly focuses solely on the point in time of the altercation and shooting. However, the far more relevant time periods are those prior to and after the altercation and shooting. As the prior discussion demonstrates, it is beyond reasonable dispute that C.A.S. would have repeatedly directed his attention at P while in P's presence without the stresses and distractions of a violent encounter.
3. Accuracy of C.A.S.'s Prior Description of the Shooter
¶ 35 We choose to weigh the description/accuracy factor against reliability, but not heavily and not for the reason that this factor might typically weigh against reliability.
¶ 36 Here, the investigating officers believed they had substantial evidence identifying the shooter, P, and tying P to C.A.S. and that C.A.S.'s ability to identify P was not a significant issue. Although it plainly would have been the better practice for the officers to have asked C.A.S. for a physical description of P before showing C.A.S. the photo of P, the officers obviously acted under the belief that it was only necessary that C.A.S. verify that Roberson was the man C.A.S. would readily recognize as P. Accordingly, with the exception of clothing, C.A.S. was never asked by the officers during the interview for a description of P.[3]
¶ 37 Typically, the description/accuracy issue is whether a witness's prior description was accurate or inaccurate. See, e.g. , Manson v. Brathwaite , 432 U.S. 98, 115-16 (1977) (accuracy of witness's prior description favored reliability because the description was accurate in terms of the suspect's race, height, build, hair color and style, and a high cheekbone facial feature). However, C.A.S. did not give either an accurate or inaccurate description because, apart from P's clothing, the officers did not ask C.A.S. to describe P.
¶ 38 It might be that, under these circumstances, the description/accuracy factor neither weighs for nor against reliability. However, we will assume for purposes of this opinion only that the absence of a description weighs somewhat against reliability.
4. Level of Certainty Demonstrated by C.A.S. During the Identification Procedure
¶ 39 The level-of-certainty factor weighs in favor of reliability. The video shows that, when C.A.S. was shown a photo of Roberson, he immediately and firmly responded by shaking his head up and down. The officer asked: "That's him?" and C.A.S. responded: "Yep." C.A.S. said he was "100%" sure.
¶ 40 Roberson might argue that we should not give weight to C.A.S.'s certainty because of C.A.S.'s earlier statement regarding his ability to differentiate one black person from another black person. We primarily deal with that topic below. For now, it is sufficient to say that, although C.A.S. made statements that could cause concern regarding C.A.S.'s ability to identify P from a photo because P was black, it remains true that, when C.A.S. was actually shown a photo of Roberson, C.A.S. immediately indicated that he was certain that the person in the photo was the person C.A.S. knew as P. Accordingly, the level-of-certainty factor favors reliability.
5. Length of Time Between the Shooting and the Identification Procedure
¶ 41 According to C.A.S.'s testimony, the shooting occurred "[t]owards the end of January." The identification procedure took place on February 2. The circuit court wrote that the interval was approximately two weeks. Accepting this amount of time between the shooting and the identification procedure, and considering the number, nature, and duration of contacts C.A.S. had with P, this was a relatively short amount of time. We give it some weight in favor of reliability.
6. Cross-Racial Identification-The White Witness's Ability to Differentiate a Black Person He Has Had Contact With From Other Black People
¶ 42 If we stopped with the factors above, this would be an easy case. As we have explained, C.A.S. had substantial and multiple opportunities to observe the man he knew as P under circumstances where C.A.S. would naturally become well acquainted with P's appearance. And, C.A.S. expressed complete confidence in his identification. However, the circuit court determined that the reliability of the identification was undercut by a statement C.A.S. made describing P's hair style and a response C.A.S. gave to a question about C.A.S.'s ability to identify P. We disagree that these factors so undercut reliability that the evidence of the photo identification should be suppressed.
¶ 43 Hair style . During his suppression hearing testimony, C.A.S. described P's hair style as "the dreadlocks or the corn rows." There was no follow up. C.A.S. was not asked if he knew the difference between "dreadlocks" and "corn rows" or why he used these terms in the disjunctive.
¶ 44 We agree with the circuit court's apparent adoption of the defense assertion that dreadlocks and cornrows are "very different hairstyles." But we do not agree that the record supports the circuit court's apparent view that C.A.S. did not know the difference between dreadlocks and cornrows, particularly in light of the photo of Roberson in the record.[4] The replica of the photo shown to C.A.S., presented at the suppression hearing, is a black-and-white printout of a photo somehow lifted from Roberson's Facebook account. It is blurry, but allows for the possibility that Roberson's hair was a combination of cornrows at the front top of his head and dreadlocks on the sides and back of his head. And, we repeat, there was no follow up when C.A.S. referenced "the dreadlocks or the corn rows."
¶ 45 In our view, it is not reasonable to suppose that C.A.S. does not know the difference between dreadlocks and cornrows based on the scant information before the circuit court.[5]
¶ 46 C.A.S.'s ability to differentiate P from other black persons . More troubling is C.A.S.'s response to the officer's question: "[W]ould you recognize [P]?" C.A.S. responded: "Possibly ... [unintelligible] ... I mean black people kind of look ... [unintelligible]."
¶ 47 The circuit court interpreted C.A.S. as saying that he thought "African American people look alike and [it] might be difficult to identify [P from a photo]." We agree that this is a reasonable interpretation of C.A.S.'s response. But the circuit court went much farther, stating that C.A.S. was "clearly unsure of the characteristics of African Americans" and that "[o]bjectively, it is hard to convince ones self that [C.A.S.] wouldn't have identified any picture of an African American male as 'P' if [the questioning officer] indicated that it was a picture of 'P.' " These latter statements by the circuit court, whether reviewed de novo or with deference, are not supported by the record.
¶ 48 Partway through the interview and prior to the presentation of Roberson's photo, C.A.S. told the officers about the shooting and said that if he found P he would shoot P, thus indicating that he would be able to identify P if he saw him. Further, although C.A.S. responded to the general question about C.A.S.'s ability to identify P with equivocation and a statement to the effect that black people look alike, when C.A.S. was then shown a photo of Roberson, C.A.S. did not hesitate. His response shows immediate recognition that the photo he was shown depicted the man C.A.S. knew as P. A reasonable fact finder watching the video could find that C.A.S. made a careless and racist statement in response to a general question, but that C.A.S. credibly had no trouble actually identifying the particular black male that he had spent considerable time with.
7. Totality of the Circumstances
¶ 49 The most reasonable interpretation regarding C.A.S.'s opportunity to view P, C.A.S.'s degree of attention, C.A.S.'s level of certainty, and the length of time between the shooting and the identification procedure is that these factors, taken together, heavily support reliability. We weigh the absence of a description of P against reliability, but not heavily so. We give no weight to C.A.S.'s reference to "dreadlocks or the corn rows." That leaves the response C.A.S. gave just before identifying the photo as depicting P. We conclude that this response should weigh against reliability. But we also conclude that this is a situation in which there is no substitute for viewing the video. To repeat, a reasonable fact finder watching the video could find that C.A.S. made a careless and racist statement in response to a general question, but that C.A.S. credibly had no trouble actually identifying the particular black male with whom he had spent considerable time.
¶ 50 In sum, we conclude that C.A.S.'s identification of Roberson from a photo during the interview was sufficiently reliable that a jury should hear and see the evidence of that identification. See Hibl , 290 Wis. 2d 595, ¶¶ 51-53 (explaining that courts generally rely on juries to resolve identification reliability issues).
Conclusion
¶ 51 For the reasons above, we reverse the suppression rulings of the circuit court and remand for further proceedings.
By the Court. -Order reversed and cause remanded.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5. (2015-16).

In a break from prior identification law governing when evidence of an impermissibly suggestive identification procedure requires suppression, our supreme court in State v. Dubose , 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582, held: "We conclude that evidence obtained from an out-of-court showup is inherently suggestive and will not be admissible unless, based on the totality of the circumstances, the procedure was necessary." Id. , ¶ 33.

C.A.S. testified that the "third" encounter lasted about an hour and a half to two hours. We are uncertain whether this was a reference to the last encounter we describe, or to the last two encounters combined, starting with P picking up C.A.S. and C.A.S.'s brother and sister. Accordingly, we do not rely on C.A.S.'s estimates of the duration of the encounters on this day. Regardless of C.A.S.'s time estimates, his description of the activities shows that C.A.S. would have had extended opportunities to observe P that day.

We have not attempted to determine why the police were interested in a description of P's clothing, but we discern no reason why the answer to that question would have any effect on the outcome of this appeal. There is no suggestion by the parties on appeal that C.A.S.'s description of P's clothing either did or did not match other evidence regarding P's clothing.

The State takes the position that the term "dreadlocks" has negative connotations, and for that reason instead uses "locs," except when quoting from the record. We use the term "dreadlocks" because it is the term used by Roberson's own counsel on appeal.

The State, reasonably, treats part of this topic as fact finding by the circuit court and argues that the circuit court's finding that C.A.S. did not know the difference between dreadlocks and cornrows was clearly erroneous. In the text, we do not treat the dreadlocks/cornrows topic as involving fact finding, but we also conclude that, if this is a matter of fact finding by the circuit court, we agree with the State that the finding is clearly erroneous for the reasons stated in the text.