952 A.2d 1094 (2008)
402 N.J. Super. 62
STATE of New Jersey, Plaintiff-Respondent,
v.
Cecilia X. CHEN, Defendant-Appellant.
No. A-4251-06T5.
Superior Court of New Jersey, Appellate Division.
Argued June 3, 2008.
Decided July 31, 2008.
*1096 Alan L. Zegas, Chatham, argued the cause for appellant (Law Offices of Alan L. Zegas, attorneys; Mr. Zegas, on the brief).
Carey J. Huff, Assistant Prosecutor, argued the cause for respondent (Luis A. Valentin, Monmouth County Prosecutor, attorney; Mary R. Juliano, Assistant Prosecutor, of counsel; Ms. Huff, on the brief).
Before Judges FUENTES, GRALL and WAUGH.
The opinion of the court was delivered by
GRALL, J.A.D.
Defendant Cecilia X. Chen appeals from a final judgment of conviction. A *1097 jury found Chen guilty of attempted murder, and she was sentenced to a ten-year term of incarceration, which is subject to a parole-ineligibility term of eight-and-one-half years and a five-year term of parole under the No Early Release Act, N.J.S.A. 2C:43-7.2.[1]
The identity of the attacker was the central issue at trial, and the admissibility of the identification evidence is the most significant issue raised on appeal. There was evidence that the victim initially identified Chen under highly suggestive circumstances that posed a significant risk of compromising the initial and subsequent identifications. It is undisputed that law enforcement officers had no role in creating, encouraging or permitting the highly suggestive procedures utilized at the time of the initial identification.
Although the facts of this case are unusual, general principles of evidence law address the legal issues. The judiciary has a responsibility to ensure that "evidence admitted at trial is sufficiently reliable" to be of use to the jurors in a criminal trial, and the rules permit courts to exclude evidence that does not meet the threshold of reliability required for admission. The rules also permit courts to exclude evidence that is of such questionable reliability that its probative value is substantially outweighed by the risk of prejudice and misleading the jury. State v. Michaels, 136 N.J. 299, 316, 642 A.2d 1372 (1994); see State v. Williams, 39 N.J. 471, 489, 189 A.2d 193 (1963) (discussing conditions for admission of out-of-court identifications); N.J.R.E. 403, 803. Even when law enforcement agents are not involved, evidence that an identification was made under highly suggestive circumstances that pose a significant risk of misidentification calls the reliability of the initial and subsequent identifications into question. Upon a request supported by such evidence, a trial court should conduct a hearing to assess whether the evidence is sufficiently reliable or whether its reliability is so diminished by the suggestive circumstances that the probative value is substantially outweighed by the risk of prejudice and misleading the jury. See id. at 315-16, 642 A.2d 1372; N.J.R.E. 104, 403, 803.

I
Mrs. Kim, the victim of the crime, was attacked on January 26, 2005. At 4:08 p.m., she received a phone call. The caller asked for her husband. Mrs. Kim said he was not in and asked who was calling. The woman claimed to work for a bank, and when Mrs. Kim asked how she got the Kims' phone number, the caller hung up. The Kims' caller identification device indicated the call was placed from "Foley's Liquor Store," in Neptune City. The Kims' home is in Ocean Township.
After the phone call, Mrs. Kim, who was pregnant and recovering from surgery, went upstairs to rest. She was awakened by knocking at her front door.
A young woman, whom Mrs. Kim had never seen before, was standing outside. The stranger said her car had broken down and asked to use the phone. When Mrs. Kim returned with the phone, the stranger asked to use the bathroom. Mrs. Kim allowed her in and directed the woman to the bathroom. As the stranger walked toward the bathroom, Mrs. Kim *1098 noticed a computer cord hanging from her coat sleeve. Mrs. Kim called her husband and was still speaking to him when the woman came up the steps from the bathroom and stabbed her in the back, near her neck. Mr. Kim heard screams and called 9-1-1. The stranger continued to stab at Mrs. Kim with a small kitchen knife and attempted to get the computer cord around her neck.
Mrs. Kim struggled with the stranger. Her eyelid and hand were cut and her wrist was bruised. During the struggle, the stranger's eyeglasses fell from her face. Although the stranger said "I just want your money," she made no attempt to take anything. Mrs. Kim managed to pull the woman through the front door and onto the porch. Once outside, Mrs. Kim called for help.
Mrs. Schoch, who lives across the street from the Kims, heard screaming and saw Mrs. Kim fighting with the woman. Mrs. Kim managed to take the computer cord and knife away from her attacker. When she was about to use the knife to strike back, the stranger warned her not to "do anything to hurt [her] baby." As Mrs. Schoch crossed the street to help, the stranger turned, looked at Mrs. Schoch and ran away. Neither Mrs. Kim nor Mrs. Schoch saw her car.
Officer Thomas Burke of the Ocean Township Police Department arrived at the Kims' home after the attacker fled. Mrs. Kim described her attacker as a Filipino woman, approximately five feet and four inches tall, wearing a black jacket, gray hood, dark pants, brown boots and black gloves. Officers searched the area but did not find a suspect.
Sergeant Michael Clancy interviewed Mrs. Kim. She was bleeding, upset and, according to Clancy, visibly pregnant.[2] She told him she had never seen her attacker before. She described the stranger as a Filipino, Asian woman, about twenty-five years old, five feet and four inches tall and weighing between 115 and 125 pounds. Her hair was dark, and she was wearing black-frame eyeglasses, a gray scarf around her head and face, a black zip-up jacket, black gloves, dark black or blue pants, and light brown L.L. Bean style boots.
Mrs. Kim was taken to the hospital and released the same day. The police gathered the eyeglasses, computer cord and knife. Although the evidence was tested, the police were unable to obtain fingerprints or a sufficient quantity of DNA to permit an identification.
After Mrs. Kim was released from the hospital, she met Clancy at police headquarters and gave the following description in a formal, signed statement:
She was 5'3" to 5'4" anywhere between 110 to 120 lbs. She was about 20 to 25 years of age. She looked young. She was Asian and looked more like Philippine or Vietnamese. Like a darker skin, maybe Chinese but I doubt it. She had a small face. Mine is long but hers wasn't[;] she had more of a round face. She had a smaller nose. Her eyes and her cheekbone[s] were close, almost a slightly chubby face. She had a little fuller lip th[a]n me. She didn't have an accent but had a soft tone. She was wearing a black jacket, gray scarf around her head, neck and face area. She had straight black hair. She had on black pants and black gloves. The gloves were typical winter gloves with fingers, cotton or wool. They were not leather or spandex[;] they were thin and soft. She also had on brown boots that I think came up to her ankle. She was *1099 wearing glasses when she first came in. Very thin[-]framed black rim glasses. She had clean skin.
. . . .
No. Her face didn't have any scars, nothing.
When Mrs. Kim returned to her home after meeting with Clancy, she could not sleep. She attempted to draw a sketch of the woman. The following morning, she showed the sketch to her husband and her sister.
After Mr. Kim saw his wife's sketch, he suspected that Chen attacked his wife. Three days before the attack, Chen called Mr. Kim. They had dated several years before, but he had not seen or heard from her since summer 2000, when she left the New Jersey area to join the military and attend medical school. During their conversation, Mr. Kim told Chen that he had married, bought a home and was expecting the birth of his first child. Chen told him that she wondered how things would have worked out between them and that she regretted having taken him "for granted."
Mr. Kim went to the computer, searched the internet and found Chen's webpage, which had several pictures of her. He, his wife and her sister looked at the pictures. After seeing between five and ten photos, Mrs. Kim was "90 percent positive" that Chen was her attacker. She was not completely certain because, unlike the woman who attacked her, Chen was smiling and was not wearing eyeglasses when the pictures were taken.
Mr. Kim printed two of the pictures from Chen's website. In one picture she was with her female cousin; in the other she was with a female friend. Still less than certain, Mrs. Kim described the eyeglasses the intruder wore. Her sister then drew eyeglasses on Chen's photograph. When Mrs. Kim saw the altered picture, she was completely certain that Chen was the woman who attacked her.
Later that day, the Kims went to police headquarters and gave Clancy Mrs. Kim's sketch and the pictures of Chen. Mrs. Kim then worked with an officer who produced a composite sketch. Mrs. Schoch, who was not present, saw that sketch in the newspaper. Both Mrs. Kim and Mrs. Schoch thought that the composite did not accurately depict the attacker's cheekbones.
Chen was arrested on November 1, 2005, and indicted on April 17, 2006. In November 2006, the police compiled a photo array. Mrs. Schoch and Mrs. Kim both selected Chen's photo. Written and video records of both identifications were made.
At trial, Clancy acknowledged that one of the reasons for delaying the photo array was concern about Mrs. Kim's having identified Chen from the photographs her husband retrieved. Mrs. Kim admitted that during the first month after the attack, she looked at Chen's photograph "over and over, but probably five [times] more or less." Mrs. Schoch was never asked whether either of the Kims showed her the photographs of Chen.
Mrs. Kim and Mrs. Schoch identified Chen at trial. In addition, Mrs. Kim's initial sketch, the photographs from Chen's website, the composite sketch and the photo array were admitted into evidence at trial. The record does not indicate whether Mrs. Kim and Mrs. Schoch were told about evidence the police obtained during the investigation subsequent to Mrs. Kim's initial identification of Chen and prior to the photo array. That evidence included a piece of paper bearing the Kims' phone number that was found in Chen's car, evidence that supported an inference that Chen lost eyeglasses similar to those found in the Kims' home and evidence that suggested *1100 Chen bought boots of the sort Mrs. Kim described on the day of the attack.
[At the direction of the court, its discussion of additional evidence not pertinent to the identifications has been omitted from this opinion.]
Chen was born in May 1975 in Beijing. Her height and weight is not included in the record provided on appeal. Mrs. Kim is of Korean ancestry. Chen essentially agreed with Mr. Kim's account of their telephone conversation on January 23 and explained that she was under the influence of alcohol. Chen presented testimony and evidence to establish that she frequently has acne, her shoe-size is seven-and-one-half, and she has never owned a gray hooded sweatshirt or eyeglasses like the pair found in the Kims' home.

II
Acknowledging that the photo array compiled and exhibited by the police was in all respects appropriate, Chen's attorney requested a "Wade" hearing because Mrs. Kim's initial identification of Chen was made under highly suggestive circumstances that tainted all subsequent identifications. Because defense counsel did not allege that the police were involved, the trial court concluded that Wade did not require a hearing on admissibility. The court advised defense counsel "that all of the things [he] wished to argue going to the weight and the credibility of the identification" would be available to him. He did not renew or recast his argument.[3]
Neither the United States Supreme Court, nor the New Jersey Supreme Court, nor this court has held that identification evidence must be excluded based on the suggestive words or conduct of a private citizen. The issue in Wade was a post-indictment line-up conducted by law enforcement officers without notice to and in the absence of the defendant's counsel. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In Stovall v. Denno, the Court considered an identification made when the police brought the defendant to the victim's hospital room. 388 U.S. 293, 295, 87 S.Ct. 1967, 1969, 18 L.Ed.2d 1199, 1202 (1967). In Simmons v. United States, 390 U.S. 377, 383, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968), the Court considered whether there was "improper employment of photographs by police" that warranted exclusion of identification evidence. And, in State v. Farrow, 61 N.J. 434, 451, 294 A.2d 873 (1972), the New Jersey Supreme Court held "the preliminary inquiry as to admissibility [of photo identifications and subsequent in-court identifications of a defendant in a criminal trial] is whether the choice made by the witness represents his own independent recollection or whether it in fact resulted from the suggestive words or conduct of a law enforcement officer."[4]
Where the right to counsel is not at issue, the constitutional basis for exclusion of identification as a consequence of law enforcement's use of suggestive identification techniques is a denial of due process *1101 of law. Stovall, supra, 388 U.S. at 301-02, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206. In Stovall, the Court relied upon a due process principle stated in Palmer v. Peyton:
A state may not rely in a criminal prosecution upon evidence secured by pumping a man's stomach, by breaking into his home, or by employing subtle psychological methods on him; nor may it rely on an identification secured by a process in which the search for truth is made secondary to the quest for a conviction.
[359 F.2d 199, 202 (4th Cir.1966) (footnotes omitted).]
Defendant argues that the Supreme Court extended the reach of the due process clause to require exclusion of unreliable identifications based on suggestive words and conduct of private citizens in Manson v. Brathwaite, 432 U.S. 98, 101, 97 S.Ct. 2243, 2246, 53 L.Ed.2d 140, 146 (1977). Manson did not so hold.
First, words and conduct of private citizens were not at issue in Manson. Ibid. The Court framed the issue presented as follows: "[W]hether the Due Process Clause of the Fourteenth Amendment compels the exclusion, in a state criminal trial, apart from any consideration of reliability, of pretrial identification evidence obtained by a police procedure that was both suggestive and unnecessary." Id. at 99, 97 S.Ct. at 2245, 53 L.Ed.2d at 144 (emphasis added).[5] In Manson, as in Stovall, the Court explained that the standard is "fairness as required by the Due Process Clause of the Fourteenth Amendment." Id. at 113, 97 S.Ct. at 2252, 53 L.Ed.2d at 153. Like the Court of Appeals in Palmer, the Court relied on cases involving government conduct. Manson, supra, 432 U.S. at 113, 97 S.Ct. at 2252, 53 L.Ed.2d at 153.
Second, the question resolved in Manson, which had been answered differently by the Courts of Appeals, was whether the exclusionary rule adopted in Stovall to deter law enforcement officials from using unnecessarily suggestive identification techniques to obtain evidence for purposes of prosecution should be applied in all cases or only in those where the unnecessarily suggestive procedures led to an identification that was unreliable under the totality of the circumstances. Id. at 110-11, 97 S.Ct. at 2250-51, 53 L.Ed.2d at 151; see Stovall, supra, 388 U.S. at 297, 87 S.Ct. at 1970, 18 L.Ed.2d at 1203.
Recognizing that exclusion of reliable identifications would have a negative impact on the administration of justice, the Court concluded that only identifications that are not reliable under the totality of the circumstances should be excluded. Manson, supra, 432 U.S. at 112-13, 97 S.Ct. at 2252, 53 L.Ed.2d at 152-53. In that context, the Court noted that "reliability is the linchpin." Id. at 112-14, 97 S.Ct. at 2252-53, 53 L.Ed.2d at 152-54. Thus, the constitutional rule is based on the government's use of unnecessarily or impermissibly suggestive identification procedures and the admission of unreliable identification evidence acquired in that manner.
The Court reasoned that use of suggestive identification procedures, unlike a constitutionally unreasonable search, does not "in itself intrude upon a constitutionally protected interest." Id. at 113 n. 13, *1102 114, 97 S.Ct. at 2252 n. 13, 2253, 53 L.Ed.2d at 153 n. 13, 154. The Court also reasoned that Stovall's exclusionary remedy protects an evidentiary interest, which is limited in an adversarial system that generally relies on measures such as cross-examination and closing argument to highlight the suggestibility of identification procedures and the resulting diminished probative value of identification evidence obtained. Id. at 113 & n. 14, 114, 97 S.Ct. at 2252 & n. 14, 2253, 53 L.Ed.2d at 153 & n. 14.
Manson's explanation for limiting the exclusionary rule is not the equivalent of a declaration that the due process clause compels exclusion of unreliable identifications suggested by private persons.[6]See Reese v. Fulcomer, 946 F.2d 247, 259 (3d Cir.1991) (rejecting a challenge to identification on the ground that the government had not initiated or arranged for the victim's boyfriend to drive her past the defendant's home), cert. denied, 503 U.S. 988, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992); United States v. Stevens, 935 F.2d 1380, 1390 n. 11 (3d Cir.1991) (concluding that a defendant must show that government agents arranged a suggestive confrontation to establish constitutional grounds for exclusion); People v. Owens, 97 P.3d 227, 233-34 (Colo.Ct.App.2004) (discussing decisions reaching different conclusions on the need for suggestive action by state actors, noting that the majority of courts require state involvement in the suggestive conduct and concluding that in some cases the rules of evidence may require exclusion on a different basis when there is no state action).
In this case, it was not error to deny defense counsel's request for a "Wade" hearing. Defense counsel conceded that law enforcement played no role in suggesting Chen's identification, and the trial court correctly noted that Wade, and other decisions addressing "impermissibly suggestive" identifications, involve techniques employed by law enforcement officers and do not apply here.
The question remains whether the reliability of the identifications should have been assessed on grounds not suggested by defense counsel's invocation of Wade. Defendant contends that principles of "basic fairness" require a preliminary hearing when there is evidence of suggestive conduct by private actors. Although the issue was not clearly raised by the argument presented to the trial court, we consider the question because of its importance to the reliability of jury verdicts in criminal trials. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).
*1103 Our analysis is informed by the extreme importance of identification evidence in criminal trials, the fact that suggestions made at the time of an identification contribute to mistaken identification, and the long-undisputed role of misidentifications in producing wrongful convictions. See Herrera, supra, 187 N.J. at 501-02, 902 A.2d 177 (and cases cited therein); id. Appendix A at 511-20 (which includes guidelines and an explanation issued by Attorney General John J. Farmer, Jr. in the exercise of the Attorney General's duty to "ensure that justice is done and the criminal justice system is fairly administered"); id. at 525-28, 902 A.2d 177 (Albin, J. dissenting). There is no need to elaborate on those propositions, which have been stated and documented so well elsewhere.
There is also no need to consider whether the due process right to a fair trial requires exclusion of unreliable identification evidence, regardless of the source of the taint, based on the State's attempt to use the evidence at trial. Our evidence rules, as interpreted and applied by our courts, address the problem of unreliable evidence.
"Competent and reliable evidence remains at the foundation of a fair trial, which seeks ultimately to determine the truth about criminal culpability." Michaels, supra, 136 N.J. at 316, 642 A.2d 1372. Courts have a "responsibility to ensure that evidence admitted at trial is sufficiently reliable so that it may be of use to the finder of fact who will draw the ultimate conclusions of guilt. . . ." Ibid. Generally, our courts have fulfilled the responsibility by applying the law of evidence.
"The foundation of our evidence rules, at least insofar as jury trials are concerned, is to provide the fact-finder with only reliable and probative evidence." State v. A.O., 397 N.J.Super. 8, 30, 935 A.2d 1202 (App.Div.2007) (Weissbard, J.A.D. concurring) (recommending rejection of polygraph evidence despite a stipulation on admissibility on the ground of its unreliability and its inherently prejudicial character), certif. granted, 194 N.J. 446, 945 A.2d 1289 (2008).
Only evidence that is relevant is admissible, N.J.R.E. 402. Relevance is a function of probative value; by definition, evidence is not relevant unless it has a "tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401 (emphasis added). Evidence that is wholly unreliable has no tendency to prove or disprove anything. Even when evidence has some probative value, if that "probative value" is "substantially outweighed by the risk of [ ] undue prejudice . . . or misleading the jury" the evidence may be excluded. N.J.R.E. 403.
Rules governing admissibility of testimony and opinion evidence also serve to ensure reliability. Witnesses, other than experts, cannot testify unless they have "personal knowledge" of the matter, N.J.R.E. 602, and "opinions and inferences" offered by a lay witness must be excluded if not "rationally based on the perception of the witness," N.J.R.E. 701. This "requirement of firsthand knowledge. . . represents a most pervasive manifestation of the common law insistence upon the most reliable sources of information.. . ." Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469, 482 (1993) (quoting Advisory Committee's Notes on Fed. R.Evid. 602, 28 U.S.C.App., p. 755) (internal quotation omitted). Firsthand knowledge is not essential to admission of expert testimony, only because it is assumed that "the expert's opinion will have a reliable basis in the knowledge and experience of [the] discipline." Ibid.; see N.J.R.E. 702 *1104 (stating conditions for admission of expert testimony).
Before Wade was decided, our Supreme Court concluded that "a witness' prior, out-of-court identification of an accused, if made under circumstances precluding suspicion of unfairness or unreliability," could be admitted at trial. Williams, supra, 39 N.J. at 489, 189 A.2d 193 (emphasis added); accord N.J.R.E. 803(a)(3) (prior identification admissible "if made in circumstances precluding unfairness or unreliability"). And in a variety of circumstances, the Court has required preliminary hearings, pursuant to N.J.R.E. 104, to assess the admissibility of evidence of guilt when its reliability is in question and the risk of prejudice is great.
In Michaels, the witnesses were subjected to "coercive or highly suggestive interrogation techniques" that created a "significant risk" of "undermining the reliability" of their pre-trial statements and their testimony at trial. 136 N.J. at 312-16, 642 A.2d 1372. The Court concluded that it was appropriate to "use the procedural protection of pretrial hearing to cleanse a potential prosecution from the corrupting effects of tainted evidence" and assure that the State's evidence was sufficiently reliable. Id. at 316-17, 642 A.2d 1372. The trial court was asked to determine "whether, despite the presence of some suggestive or coercive interview techniques, when considering the totality of the circumstances surrounding the interviews, the statements or testimony retain a degree of reliability sufficient to outweigh the effects of the improper interview techniques." Id. at 321, 642 A.2d 1372.
Concern about the reliability of identification evidence relevant to guilt led the Court to hold that hypnotically-refreshed testimony is inadmissible against a defendant in a criminal trial. State v. Moore, 188 N.J. 182, 902 A.2d 1212 (2006). The Court reasoned that "[t]he theory that hypnosis is a reliable means of improving recall is not generally accepted in the scientific community" and "that procedural safeguards [could not] guard effectively against the risks associated with hypnotically refreshed testimony." Id. at 210, 902 A.2d 1212; id. at 208-10, 902 A.2d 1212 (discussing evidence on the lack of reliability and the likely harmful effects on the truth-seeking function when a witness who testifies is confident in a mistaken identification influenced by hypnosis).
Before Moore, the Court required a case-by-case analysis of the reliability of hypnotically-refreshed identification evidence in preliminary hearings on admissibility. The Court concluded that if hypnosis "is not capable of yielding reasonably reliable results, then its probative value may be outweighed by the risks entailed in its use in a criminal trial." State v. Hurd, 86 N.J. 525, 536, 432 A.2d 86 (1981) (relying on the trial court's authority to exclude evidence pursuant to former Evid. R. 4, currently N.J.R.E. 403).
While we recognize that extraordinary investigative tactics were at issue in Michaels and that the police were involved in the hypnotism at issue in Moore and Hurd, we conclude that evidence of a private actor's words or conduct that is so highly suggestive as to pose a significant risk of misidentification also warrants the scrutiny of a preliminary hearing pursuant to N.J.R.E. 104. Judge DeStefano reached that conclusion in State v. McCord, 259 N.J.Super. 217, 611 A.2d 1160 (Law Div.1992), a case in which a shopkeeper identified the defendant the day after she saw someone take rings from her store. She made the identification while the defendant was detained by private security guards and handcuffed to a chair in their office. Id. at 219, 611 A.2d 1160. A preliminary hearing was appropriate *1105 under those circumstances, which were highly suggestive and posed a significant risk of misidentification. Pursuant to N.J.R.E. 803(a), the State must establish that an identification made by a witness out of court was made under circumstances precluding unfairness or unreliability as a condition of admissibility when the prior declaration of identity is not contained in a writing, not made under oath or not offered to rebut a claim of fabrication, improper influence or motive.
Other courts have relied on similar fundamental principles of evidence law to address reliability when the due process right recognized in Manson, Simmons and Stovall is not implicated. For example, in State v. Hibl, 290 Wis.2d 595, 714 N.W.2d 194, 201-02, 205-06 (2006), the Supreme Court of Wisconsin held that trial judges, in the exercise of their gate-keeping function, should exclude such evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Id. at 201 (citing Wis. Stat. § 904.03, which is the substantial equivalent of N.J.R.E. 403); accord Owens, supra, 97 P.3d at 233-34; see also State v. Holliman, 214 Conn. 38, 570 A.2d 680, 684 (1990) (concluding that absence of state action precluded a constitutional claim but noting, presumably under Connecticut's evidence rules, that the admissibility of identification evidence obtained under suggestive circumstances should be addressed under the standards articulated in Manson); Commonwealth v. Jones, 423 Mass. 99, 666 N.E.2d 994 (1996) (relying upon common law principles of fairness); People v. Blackman, 110 A.D.2d 596, 488 N.Y.S.2d 395, 397 (1985) (concluding that where private action is suggestive, "[f]airness under the 5th Amendment certainly requires that the proponents of [the identification] evidence meet a threshold of at least minimal reliability" and evidentiary rules require trial courts to determine preliminary questions of admissibility and witness competency).
Requiring a preliminary hearing to assess the impact of suggestive conduct by private actors is consistent with the approach our Supreme Court took in addressing the problem of evidence suggested by hypnosis in Hurd and by "coercive and suggestive" interrogation techniques in Michaels. It also is consistent with the Court's efforts to limit the potential for wrongful conviction based on unreliable identification evidence. See Adams, supra, 194 N.J. at 203-05, 943 A.2d 851 (discussing the measures).[7]
Accordingly, we hold that in the proper discharge of their gate-keeping function pursuant to N.J.R.E. 403 and N.J.R.E. 104, trial courts should grant a request for a preliminary hearing when the reliability of the State's identification evidence is called into question by evidence of highly suggestive words or conduct by private actors that pose a significant risk of misidentification.[8] We require *1106 this preliminary hearing in recognition of the potential that the use of such highly suggestive techniques may undermine the reliability, and a fortiori the probative value, of the identification evidence; the enhanced risk of misidentification attributable to suggestiveness at the time of the initial identification; and the risk of prejudice and misleading the jury that is so likely to result in wrongful conviction based on misidentification.
In balancing the probative value and the risk of the identification evidence, trial courts should apply the familiar two-step analysis utilized when suggestive identification techniques employed by law enforcement agents are at issue. Herrera, supra, 187 N.J. at 503, 902 A.2d 177; see Owens, supra, 97 P.3d at 232-33, 235 (referencing factors trial courts should consider in balancing probative value and risk, including those identified in Manson and Biggers). Thus, to determine whether the identification is reliable, the trial court must consider the totality of the circumstances and weigh factors indicative of reliability  "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation"  against the "corrupting effect of the" private actor's highly suggestive words or conduct. Manson, supra, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154; Herrera, supra, 187 N.J. at 503-04, 902 A.2d 177.
When the balance of the factors indicative of reliability and the corrupting effect of the highly suggestive words or conduct discloses a very substantial likelihood of misidentification, then the evidence of that identification must be excluded. Biggers, supra, 409 U.S. at 198, 93 S.Ct. at 381, 34 L.Ed.2d at 410. If the balance indicates "a very substantial likelihood of irreparable misidentification," identification evidence obtained subsequently and any in-court identification also must be excluded. Ibid.; see Manson, supra, 432 U.S. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155; Biggers, supra, 409 U.S. at 198-200, 93 S.Ct. 375, 381-82, 34 L.Ed.2d 401, 410-11; Adams, supra, 194 N.J. at 203-04, 943 A.2d 851; Romero, supra, 191 N.J. at 74-75, 922 A.2d 693; Herrera, supra, 187 N.J. at 506-07, 902 A.2d 177.
In such a case, exclusion is required because the evidence is not sufficiently reliable. When an identification is not sufficiently reliable, its probative value is substantially outweighed by the risk of undue prejudice and misleading the jury; that is an obvious risk when there is a very substantial likelihood of misidentification. N.J.R.E. 403.
Conversely, when the two-step analysis leads the trial court to conclude that the identification is reliable  i.e., that, under the totality of the circumstances, there is neither a very substantial likelihood of misidentification at that time nor a very substantial likelihood of irreparable misidentification  then the evidence of the pre-trial identifications and in-court identifications should be admitted. Absent that very substantial likelihood of misidentification, courts must assume that there is no risk of undue prejudice or misleading the jury that cannot be addressed by cross-examination and jury instructions that *1107 comply with controlling precedents. Such "evidence is for the jury to weigh," like other evidence that has "some element of untrustworthiness [and] is customary grist for the jury mill." Manson, supra, 432 U.S. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155.
We stress that we have limited a trial court's obligation to conduct a preliminary hearing to assess the reliability of identification testimony based on a claim of suggestive conduct by private actors to cases in which the request is supported by evidence of "highly suggestive words or conduct that pose a significant risk of misidentification." Generally, assuming the minimal degree of reliability and personal knowledge essential for relevance and competency, N.J.R.E. 401, 601, 701, 803, the responsibility for assessment of the persuasive value of testimony rests with jurors who have the opportunity to consider the evidence tested by cross-examination and with the guidance of appropriate jury instructions. N.J.R.E. 402; see Michaels, supra, 136 N.J. at 316, 642 A.2d 1372 (noting that "reliability assessments with respect to the admissibility of out-of-court statements are commonplace, [but] assessing reliability as a predicate to the admission of in-court testimony is a somewhat extraordinary step" (citations omitted)); Williams, supra, 39 N.J. at 489, 189 A.2d 193.
In this case, there was sufficient evidence to require a preliminary hearing. Mrs. Kim identified Chen under highly suggestive circumstances that posed a significant risk of misidentification. Mrs. Kim, her husband and her sister reviewed a series of photographs of Chen together, after Mr. Kim came to suspect Chen. It is reasonable to infer that he shared his suspicion with his wife, if for no other reason than to explain why he wanted her to look at photographs of his former girlfriend on the day after she was attacked in their home. Mrs. Kim viewed many photographs depicting Chen, in the presence of her husband and her sister. Two were selected and printed for further study. In both photographs Chen was with another woman. Even if we were to assume that Mr. Kim did not point out Chen, which we are unwilling to do on this record, there was that suggestion. Chen was the only woman who appeared in both photographs. When Mrs. Kim was less than certain about whether Chen was her assailant, she explained why. In response, her sister altered the photograph to show Chen wearing the eyeglasses of the type Mrs. Kim described. At that point, Mrs. Kim made the identification.
Subsequent to that initial identification, Mrs. Kim assisted in the preparation of a composite sketch. Mrs. Schoch saw that sketch in the newspaper.
After the composite sketch was drawn, Mrs. Kim reviewed the photographs numerous times during the twenty-two months between the crime and her identification of Chen in the post-indictment photo array. Mrs. Kim understandably was upset by the attack during her pregnancy, and she knew that Chen was aware that she and her husband were expecting a child.
The record does not indicate whether Mrs. Kim was told that a paper bearing her phone number was found in Chen's car before she saw the photo array. The record does not reveal whether Mrs. Schoch saw the photographs Mr. Kim took from the website or whether she was told about Chen's relationship with Mr. Kim, the phone calls that preceded the attack, or the phone number found in Chen's car before she saw the photo array.
Evidence of much less influential and suggestive conduct has been deemed highly *1108 suggestive when law enforcement officers are the actors. Simmons, supra, 390 U.S. at 383-84, 88 S.Ct. at 970-71, 19 L.Ed.2d at 1252-53 (discussing a suggestive practice employed in photo identifications including display of the picture of a single individual, the pictures of several persons among which the photograph of a single individual appears more than once, the fact that the witness has been told that there is other evidence linking the suspect to the crime, and the likelihood that the witness will retain the image of the photograph rather than the perpetrator).
There is substantial evidence indicative of the reliability of the identifications in this case. Nonetheless, because this trial was held without a preliminary hearing, we cannot determine whether the evidence of reliability is outweighed by the corrupting effect of the highly suggestive circumstances. The extent of the suggestiveness and, therefore, the weight that should be assigned to its corrupting effect is simply not clear. Thus, we are unable to say that admission of the evidence was not capable of leading "the jury to a verdict it otherwise might not have reached." State v. R.B., 183 N.J. 308, 330, 873 A.2d 511 (2005); R. 2:10-2; see State v. Pasterick, 285 N.J.Super. 607, 621, 667 A.2d 1103 (App.Div.1995) (considering whether the court's failure to exclude evidence, sua sponte, pursuant to N.J.R.E. 403 amounted to plain error). The jurors were concerned about suggestiveness. During deliberations, they asked the court whether there was any evidence that Mrs. Schoch saw the photographs taken from Chen's website.
Because there is no other claim of error warranting reversal of Chen's convictions, we remand to permit the trial court to conduct a hearing on admissibility. If the trial court concludes that the evidence is admissible under the standards described above, the convictions are affirmed. If the trial court concludes that the evidence should have been excluded, the convictions are reversed and a new trial must be held without the unreliable evidence. See State v. Henderson, 397 N.J.Super. 398, 417, 937 A.2d 988 (App. Div.) (ordering a preliminary hearing under similar terms), certif. granted, 195 N.J. 521, 950 A.2d 907 (2008).
[At the direction of the court, the discussion of the remaining issues raised on appeal has been omitted from this opinion.]
Remanded for further proceedings.
NOTES
[1] The jurors also found defendant guilty of second-degree aggravated assault, N.J.S.A. 2C:12-1b(1); two counts of fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5d; and two counts of third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d. Those convictions were merged with Chen's conviction for attempted murder. The jurors acquitted defendant of robbery, N.J.S.A. 2C:15-1.
[2] According to Mr. and Mrs. Kim, her pregnancy was not apparent.
[3] The transcript reflects that defense counsel had not submitted a brief on the motion, and he did not ask for an opportunity to submit a brief.
[4] Recent disagreements among the members of the New Jersey Supreme Court related to suggestive identification involve the scope of the exclusionary remedy and not the basis for its application. See State v. Herrera, 187 N.J. 493, 501, 902 A.2d 177 (2006); id. at 520-30, 902 A.2d 177 (Albin, J. dissenting) (reasoning that "it is fundamentally unfair for the police to unnecessarily employ a technique that maximizes the potential for error"); see also State v. Adams, 194 N.J. 186, 210-11, 943 A.2d 851 (2008) (Albin, J. concurring); State v. Romero, 191 N.J. 59, 81-83, 922 A.2d 693 (2007) (Albin, J. concurring).
[5] The Manson Court cited United States v. Lovasco, 431 U.S. 783, 790, 97 S.Ct. 2044, 2048-49, 52 L.Ed.2d 752, 759 (1977), a case addressing delay in the return of an indictment and the resulting staleness of the evidence, and Rochin v. California, 342 U.S. 165, 170-72, 72 S.Ct. 205, 208-09, 96 L.Ed. 183, 188-90 (1952), a case addressing involuntary pumping of a suspect's stomach to gather evidence of a crime, a method shocking to the conscience. Manson, supra, 432 U.S. at 113, 97 S.Ct. at 2252, 53 L.Ed.2d at 153.
[6] We are not persuaded by decisions in which other courts have concluded that Manson provides a constitutional basis for exclusion of identification evidence influenced by suggestive procedures in which the government had no part. Some of those cases rely on the "linchpin" of "reliability" that was employed in Manson to narrow the scope of the exclusionary rule. On that basis, those decisions extend the exclusionary rule to all unreliable identifications involving suggestive confrontations. See, e.g., United States v. Bouthot, 878 F.2d 1506, 1515-16 (1st Cir.1989). Others rely on the following statement in Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972): "It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in Foster." See, e.g., Thigpen v. Cory, 804 F.2d 893, 894 (6th Cir.1986), cert. denied, 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987) (considering accidental encounters and one police procedure). But Foster and Biggers both involved the admissibility of identification resulting from procedures employed by the police, a fact the Court did not repeat in every sentence. Biggers, supra, 409 U.S. at 196, 93 S.Ct. at 380, 34 L.Ed.2d at 409; Foster v. California, 394 U.S. 440, 442-43, 89 S.Ct. 1127, 1128-29, 22 L.Ed.2d 402, 406-07 (1969).
[7] In State v. Delgado, the Court required a written record of the identification procedure. 188 N.J. 48, 63, 902 A.2d 888 (2006). In Romero, the Court required the trial court to direct jurors that "eyewitness identification evidence requires close scrutiny and should not be accepted uncritically." 191 N.J. at 75, 922 A.2d 693. In Herrera, the Court asked its committees to consider whether the model jury charge should be amended to reference suggestibility and other factors not included in the jury charge drafted in 1999. 187 N.J. at 510, 902 A.2d 177. And, in State v. Cromedy, the Court required a cross-racial identification instruction in cases raising that issue. 158 N.J. 112, 126-33, 727 A.2d 457 (1999).
[8] This standard assumes that the State has made the threshold showing of reliability for any out-of-court identification required by N.J.R.E. 803. The standard we adopt  "highly suggestive words or conduct that pose a substantial risk of misidentification"  is an appropriate substitute for terms such as "impermissibly" and "unnecessarily" suggestive that are used in the context of suggestive circumstances created by law enforcement. When there is no state action, it makes little sense to use terms such as "impermissibly" or "unnecessarily" suggestive. This case illustrates the point. There was nothing impermissible about what Mr. Kim did here.