[912 NE2d 37, 884 NYS2d 205]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NOEL MARTE, Appellant.

Argued May 6, 2009; decided June 11, 2009

584

**POINTS OF COUNSEL**

*Paul Skip Laisure,* New York City, and *Lynn W.L. Fahey* for appellant. I. Appellant was denied due process when the hearing court refused to suppress the complainant's unreliable lineup identification, which was the product of an unduly suggestive pretrial photographic showup arranged by the complainant's sister, on the ground that the suggestiveness was not the result of police misconduct. (*People v McQueen,* 170 AD2d 696; *People v Pries,* 206 AD2d 873; *United States v Wade,* 388 US 218; *Neil v Biggers,* 409 US 188; *Manson v Brathwaite,* 432 US 98; *Stovall v Denno,* 388 US 293; *Foster v California,* 394 US 440; *People v Adams,* 53 NY2d 241; *People v Gee,* 99 NY2d 158; *People v Edmonson,* 75 NY2d 672.) II. Because the People failed to prove, and the jury did not find beyond a reasonable doubt, that the assault and robbery stemmed from separate and distinct acts, appellant's consecutive sentences are illegal under Penal Law § 70.25 (2) and violated his rights to due process and a jury trial under *Apprendi v New Jersey* (530 US 466 [2000]). (*People v Laureano,* 87 NY2d 640; *People v Catone,* 65 NY2d 1003; *People v Rosas,* 8 NY3d 493; *People v Hamilton,* 4 NY3d 654; *People v Underwood,* 52 NY2d 882; *People v Martinez,* 138 AD2d 251; *People v Smiley,* 121 AD2d 274; *People v Whitaker,* 97 AD2d 555; *People v Murray,* 299 AD2d 225; *People v Amato,* 1 AD3d 713.)

*Charles J. Hynes, District Attorney,* Brooklyn (*Camille O'Hara Gillespie* and *Leonard Joblove* of counsel), for respondent. I. Defendant's claim regarding the admission of the identification testimony of the complainant is in part unpreserved for appellate review. In any event, that claim is meritless because the police had no role in the complainant's identification of defendant from a photograph. Moreover, the circumstances of the complainant's photographic identification of defendant were not unnecessarily suggestive. (*People v Montgomery,* 88 NY2d 1041; *People v Robinson,* 74 NY2d 773, 493 US 966; *People v Fleming,*

70 NY2d 947; *People v Tutt,* 38 NY2d 1011; *Dowling v United States,* 493 US 342; *United States v Lovasco,* 431 US 783; *Mooney v Holohan,* 294 US 103; *Patterson v New York,* 432 US 197; *De-Shaney v Winnebago County Dept. of Social Servs.,* 489 US 189.) II. Defendant has failed to preserve for appellate review his claim that the imposition of consecutive sentences violated his constitutional right to a jury trial. In any event, both that claim and his claim that the imposition of consecutive sentences violated Penal Law § 70.25 are meritless. (*Apprendi v New Jersey,* 530 US 466; *People v Salcedo,* 92 NY2d 1019; *People v Laureano,* 87 NY2d 640; *People v Day,* 73 NY2d 208; *People v Ramirez,* 89 NY2d 444; *People v Rosas,* 8 NY3d 493; *People v Abrew,* 95 NY2d 806; *People v Bryant,* 92 NY2d 216; *People v Lewis,* 268 AD2d 249; *People v Rubero,* 294 AD2d 310.)

## OPINION OF THE COURT

Smith, J.

We held in *People v Adams* (53 NY2d 241 [1981]) that evidence of an unnecessarily suggestive police-arranged identification of a criminal suspect must be suppressed as a matter of state constitutional law. We hold today that no similar per se rule applies to an identification in which the police are not involved. While suggestiveness originating with private citizens can create a risk of misidentification, that risk does not justify an automatic, constitutional rule of exclusion.

I

The victim, whom we will call Peter L., was robbed and shot in the chest near his home. In the months following the robbery, he looked at hundreds of photographs shown him by the police, not including defendant's. He did not identify any of the men pictured as his attacker, and eventually he gave up the effort, telling a police officer that he did not think he would be able to pick anyone out.

Peter's 14-year-old sister, whom we will call Margaret, had known defendant in junior high school. Some six months after the crime, defendant and Margaret met again at Margaret's home, and defendant told her, "I actually shot someone on this block." Margaret, who had been violating family rules by meeting defendant, kept silent for some weeks, but then (according to her testimony) told Peter that she thought she knew who shot him, and showed him defendant's picture. Peter first rejected the suggestion, then reconsidered, took the picture

from Margaret, and decided that the person pictured was his attacker. Margaret reinforced this idea in a letter to her brother, quoting defendant's admission and describing defendant as "[t]he kid that everyone thinks shot you."

At this point, Peter and Margaret went to the police, who arranged a lineup, from which Peter selected defendant. At trial, Peter again identified defendant as his attacker. Defendant's pretrial motion to suppress identification testimony was denied, and defendant was convicted of robbery and assault. The Appellate Division affirmed (52 AD3d 737 [2008]), and a Judge of this Court granted leave to appeal (11 NY3d 833 [2008]). We now affirm.

## II

In *United States v Wade* (388 US 218, 236-237 [1967]), the United States Supreme Court held that a postindictment lineup is "a critical stage of the prosecution," at which a defendant is entitled to counsel. In so holding, the Court remarked that "[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification" (*id.* at 228). The Supreme Court later declined to hold, however, that the federal Due Process Clause compels the exclusion of all pretrial identification evidence resulting from an unnecessarily suggestive police-arranged procedure (*Manson v Brathwaite*, 432 US 98 [1977]). The Court concluded that the admissibility of such evidence should depend on its reliability, judged according to "the totality of the circumstances" (*id.* at 110, 114).

We have interpreted the Due Process Clause of the New York Constitution differently. In *Adams*, we adopted a "rule excluding improper showups and evidence derived therefrom," while allowing in-court identifications "based on an independent source" (53 NY2d at 250-251). *Adams*, like most other cases imposing constitutional limits on identification procedures, involved suggestiveness originating with law enforcement officers; *Adams* refers specifically to "suggestive identification procedures employed by the police" (53 NY2d at 251). Defendant here argues, however, that the rule of *Adams* should apply even where the source of suggestion is a private citizen.

Defendant says that this broadening of *Adams* is justified because the exclusionary rule applicable to suggestive identifications—unlike the rule applicable to coerced confessions, or

evidence obtained in an unlawful search—is designed not just to deter police misconduct, but to advance the search for truth— "to reduce the risk," as we said in *Adams* "that the wrong person will be convicted" (53 NY2d at 251). Since a private citizen's suggestion can have the same tendency to produce wrongful convictions as a police officer's, defendant argues that the resulting evidence should be suppressed in both cases.

We reject this argument. It is true that the rule of *Adams* is designed to enhance the truth finding process, and to prevent wrongful convictions. It does so, however, largely through its effect on police procedures: the knowledge that evidence resulting from unnecessarily suggestive identifications will be suppressed leads the police to avoid such suggestiveness, and to conduct careful and fair lineups whenever they can. As we said in *People v Logan* (25 NY2d 184 [1969]), "The exclusionary rules were fashioned to deter improper conduct on the part of law enforcement officials which might lead to mistaken identifications" (*id.* at 193 [citation omitted]). While the New York rule is different from the one adopted by the Supreme Court in *Manson v Brathwaite*, the rules have an important purpose in common: to assure that "[t]he police will guard against unnecessarily suggestive procedures . . . for fear that their actions will lead to the exclusion of identifications as unreliable" (432 US at 112 [footnote omitted]).

In other words, the primary goal of *Adams* is not to keep evidence of flawed identifications from the factfinder, but to assure, to the extent possible, that the identifications are not flawed in the first place. This goal cannot be advanced by extending the rule of *Adams* to cases like this one. The family, friends and acquaintances of crime victims, unlike police officers, are highly unlikely to regulate their conduct according to rules laid down by courts for the suppression of evidence. No imaginable rule of law could have discouraged Margaret from showing Peter defendant's photograph, or from telling him her reason for doing so. A per se rule prohibiting the use of evidence that results from such private communications would deny much valuable information to the factfinder, without any corresponding gain in the fairness of the means used to identify alleged criminals.

No authority in our Court, and none in the United States Supreme Court, gives any support to defendant's theory that rules authorizing suppression of eyewitness evidence tainted by suggestion should be applied when the suggestion did not come

from law enforcement. Defendant relies, however, on several federal Court of Appeals cases: *Raheem v Kelly* (257 F3d 122 [2d Cir 2001]), *Dunnigan v Keane* (137 F3d 117 [2d Cir 1998]), *United States v Bouthot* (878 F2d 1506 [1st Cir 1989]), *Thigpen v Cory* (804 F2d 893 [6th Cir 1986]) and *Green v Loggins* (614 F2d 219 [9th Cir 1980]). We are not bound by these decisions, and need not decide whether we think them correct; none of them goes as far as defendant would have us go here.

In all these cases except *Dunnigan*, the suggestive identifications were the result of the actions of police or prosecutors. The suggestiveness was not the fault of the law enforcement officials, but the courts held that that did not immunize the identifications from scrutiny under the federal "totality of the circumstances" rule. (In *Bouthot*, the court emphasized the flexibility of the federal rule—in contrast to a *"per se* rule" like the rule of *Adams*—in justifying its holding [878 F2d at 1516].) In *Dunnigan*, the source of the suggestion was a private citizen, but he was a bank security official conducting an investigation. Thus it could not be said in *Dunnigan*, as it can here, that suppression of evidence would serve no deterrent purpose.

Defendant also cites cases from other states, including *State v Chen* (402 NJ Super 62, 952 A2d 1094 [App Div 2008]), *State v Hibl* (290 Wis 2d 595, 714 NW2d 194 [2006]) and *Commonwealth v Jones* (423 Mass 99, 666 NE2d 994 [1996]). Again, we need not express agreement or disagreement with these cases; none of them adopts the rule of constitutional law that defendant urges here—indeed, two of them reject it. *Chen* held that the defendant was not entitled to a *Wade* hearing where she had been identified as the result of a suggestive procedure originating with the victim's husband; the court went on to decide that a preliminary hearing on reliability should have been held, in discharge of the trial court's "gate-keeping function" under the New Jersey Rules of Evidence (402 NJ Super at 82, 952 A2d at 1105). *Hibl*, similarly, rejected the defendant's due process argument but required the lower court to consider whether the probative value of the identification evidence was substantially outweighed by the danger of prejudice and confusion (290 Wis 2d at 615, 714 NW2d at 204). *Jones* did not decide any constitutional issue, but held that "[c]ommon law principles of fairness dictate that an unreliable identification arising from the especially suggestive circumstances of this case should not be admitted" (423 Mass at 109, 666 NE2d at 1001).

Here, by contrast, the only issue before us is a constitutional issue. Defendant has not argued, and could not persuasively

argue on this record, that the evidence he challenges should be excluded as more prejudicial than probative under common-law rules of evidence (*see People v Scarola*, 71 NY2d 769, 777 [1988] ["Even where technically relevant evidence is admissible, it may still be excluded by the trial court in the exercise of its discretion if its probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury" (citations omitted)]). Like the courts in *Chen* and *Hibl*, we decline to extend a per se constitutional rule of exclusion to cases where an identification results from a suggestive communication by a private citizen (*see also State v Pailon*, 590 A2d 858 [RI 1991] [finding no state action, and thus no constitutional violation, where the source of suggestion was a private citizen]; *State v Holliman*, 214 Conn 38, 570 A2d 680 [1990] [finding no constitutional violation, but examining identification for reliability on nonconstitutional grounds]).

We acknowledge, as many courts have, the real possibility that suggestiveness that is not of police origin can contribute to misidentifications. But suggestiveness is only one of the possible sources of such mistakes. A witness to whom no one has made any suggestion can be mistaken for any one or more of many reasons—an inadequate opportunity to observe, bias, panic, racial stereotyping, difficulty in focusing on an attacker's features, or simple bad memory, among others. Where no one in law enforcement is the source of the problem, nothing justifies the per se rule defendant seeks.

Ordinarily, where the need to regulate police conduct does not justify an exclusionary rule, our system relies on juries to assess the reliability of eyewitnesses, aided by cross-examination, by the arguments of counsel, and by whatever other evidence supports or contradicts the witnesses' testimony (*see State v Pailon*, 590 A2d at 863 ["the best guarantee of due process . . . would be the opportunity for cross-examination"]; *United States v Zeiler*, 470 F2d 717, 720 [3d Cir 1972] ["When . . . there is no evidence that law enforcement officials encouraged or assisted in impermissive identification procedures, the proper means of testing eyewitness testimony is through cross-examination" (footnote omitted)]). We have recently recognized, however, that where a case depends wholly or largely on eyewitness identification, the risk of error may be unacceptably large, and we have held that, in a proper case, expert evidence may be introduced about whether eyewitnesses are likely to err (*People v LeGrand*, 8 NY3d 449 [2007]). Perhaps other safeguards would be

appropriate in particular cases, and we do not rule out the possibility that a court, in balancing probative value against prejudicial effect, may find some testimony so unreliable that it is inadmissible. The eyewitness testimony in this case was not of that description.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, READ, PIGOTT and JONES concur.

Order affirmed.