[950 NYS2d 130]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARK RUSSELL, Appellant.

First Department, September 4, 2012

**APPEARANCES OF COUNSEL**

*James Layton Koenig*, New York City, for appellant.

*Robert T. Johnson, District Attorney*, Bronx (*Peter D. Coddington* of counsel), for respondent.

## OPINION OF THE COURT

FREEDMAN, J.

Defendant was convicted of robbery in the first degree (Penal Law § 160.15 [4]) and sentenced to a nine year determinate sentence and five years' postrelease supervision based on a single witness identification made 15 days after the robbery occurred. Upon exercising our independent factual review power (CPL 470.15), we find that the verdict was against the weight of the evidence (*People v Danielson*, 9 NY3d 342, 348-349 [2007]). The videotape depicting the robbery does not corroborate the complaining witness's identification, and, viewed as a whole, the evidence does not establish beyond a reasonable doubt that the identification was accurate.

On November 22, 2006 at approximately 6:00 p.m., the complainant had just closed her store at 256 East Gun Hill Road in the Bronx when two young black men approached her and asked to enter the shop. She reopened the store and showed the men various items. Shortly thereafter, one of the men (not defendant) opened his jacket, displayed a gun and demanded to know where the money was. The other man, purportedly defendant, went behind the counter with the complainant and told her to put the money in a plastic bag. The gun holder ordered the complainant to the back of the store and tied her up with a wire. The complainant testified that she saw defendant's face at that time. When she tried to break free, the robbers tied her up tighter. She testified that she feared for her life at that point and throughout the robbery. After the robbers left, the complainant called her husband who immediately called the police. The police officers did not take fingerprints because, as they testi-

fied, the complainant stated that the robbers wore gloves. The wire used to tie the complainant's hands was tested for DNA, but nothing was found. The complainant described both robbers as being between 18 and 30 years old, five feet seven inches or five feet eight inches and having Jamaican accents, "a little." She also stated that the unarmed robber had a ponytail under his hat, but definitely not cornrows.

Fifteen days later, on December 7, 2006, the complainant, while a passenger in a car heading west and driven by her husband, passed 374 East Gun Hill Road, where defendant was sweeping the sidewalk in front of his aunt's store. The complainant, looking across four lanes of traffic, spotted defendant and asserted that he was the second (unarmed) robber. The complainant's husband pulled closer so that she could see defendant and she positively identified him. The police were called and, after the complainant spoke with them, defendant was arrested. About four hours later, the complainant identified defendant in a lineup; she was not specifically told that defendant would be in the lineup, nor did she see any of the fillers prior to her identification.

At trial, the complainant testified that she was certain that her identification was correct and that she saw defendant's face when he entered the store. She further testified that throughout the ordeal she feared for her life. Additionally, she testified that although she passed the store where defendant worked every day, she never saw him before or after the robbery until the day he was apprehended. She insisted that the robber had a ponytail, not cornrows.

Defendant denied any involvement in a robbery, testifying that he had worked at his aunt's store on the day of the robbery, closed it at the usual time, between 6:30 and 7:00 p.m., and had gone home. The videotapes of the robbery were introduced into evidence. Although there are several frontal views of the gun bearing perpetrator (who has not been apprehended), there are no similar views of the second robber, purportedly defendant. All of the views of the second person show him looking down to the side, including the view of the two robbers when they first entered the store. While, according to the police, the complainant reported that the robbers wore gloves, the video shows that they were not wearing gloves and that the second robber was biting his fingernails.

Defendant was 28 years old at the time of the robbery, and about five feet nine inches tall. He had several B misdemeanor

convictions for possession of marijuana in a public place, but no other arrests. At the time of his arrest, he wore his hair in cornrows, and both he and his aunt testified that he always wore his hair in cornrows. Defendant, whose parents are from Jamaica, was born in New York City where he was living with his large family in Brooklyn, and had worked in family businesses, earning from $26,000 to $40,000 a year, since finishing high school. He had been working in his aunt's store on Gun Hill Road, and was working there both at the time of the robbery and 15 days later when he was arrested. He and his aunt testified that he was being paid $300 a week. He also testified that he had never bitten his fingernails and demonstrated that to the jury.

In asserting that his conviction stemmed from a misidentification, defendant points to various discrepancies in testimony, including the complainant's statement that the robbers wore gloves and the police officers' reliance on this statement in not looking for fingerprints, although the video plainly shows that this was not the case. The video also shows both robbers looking down when they entered the store, but the complainant testified that she clearly saw defendant's face when she opened the store. Finally, defendant raised the nail biting inconsistency.

Defendant also avers that, since he had been working steadily in the neighborhood for several months, it is likely that the complainant, who acknowledged passing his aunt's store regularly, saw him either before or after the incident, and during the two week period that ensued after the robbery, engaged in "transference," misidentifying him as the perpetrator of the crime. He cites psychology articles on the transference phenomenon as well as the effects of stress on eyewitness memory (i.e., K.A. Deffenbacher, B.H. Bornstein, S.D. Penrod, & E.K. McGorty, *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, Law & Hum Behav, vol 28, No. 6 at 687 [2004] [accuracy is negatively affected by high level stress]). However, the prosecutor emphasized that stress increased the complainant's ability to identify the perpetrator of the robbery. Unfortunately, no expert testimony was offered at trial. Defendant further cites studies showing that the greater the lapse of time, the less accurate an identification is likely to be.

An intermediate appellate court is empowered to examine and review the record as a whole to determine whether the weight of the evidence supports the verdict and whether the People have sustained their burden of proof beyond a reasonable doubt (*People v Danielson*, 9 NY3d at 348-349; *People v Bleakley*, 69

NY2d 490 [1987]). "Essentially, the court sits as a thirteenth juror and decides which facts were proven at trial" (*Danielson* at 348; *see People v Chase*, 60 AD3d 1077 [2009]). In *People v Delamota* (18 NY3d 107 [2011]), both the majority and dissent raised concern "about the incidence of wrongful convictions and the prevalence with which they have been discovered in recent years" (*id.* at 116). The majority stated that the intermediate appellate court is empowered to

> "independently assess all of the proof; substitute its own credibility determinations for those made by the jury in an appropriate case; determine whether the verdict was factually correct; and acquit a defendant if the court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt" (*id.* at 116-117).

Although, in this case, the trial court gave a comprehensive charge concerning single witness identification, cautioning against inaccuracy and the risk of wrongful conviction and referring to matters such as length of opportunity to view the defendant, lighting conditions, suggestibility, and memory in general, no specific note was made of the 15-day gap or of the possibility of transference. Nor was anything requested or said with respect to "weapon focus" or stress although reference was made to the "mental, physical, and emotional state of the witness before, during and after the observation."

While no one factor in this case mandates reversal, the combination of factors, namely, the absence of corroborating evidence, apparent lack of a financial motive, the time interval between the event and the identification, the physical discrepancies noted, and the high degree of stress aggravated by the presence of a seemingly lethal weapon, are sufficient to warrant reversal based on the weight of the evidence. For these reasons, we reverse.

Accordingly, the judgment of the Supreme Court, Bronx County (Richard Lee Price, J.), rendered January 15, 2008, convicting defendant, after a jury trial, of robbery in the first degree, and sentencing him to a term of nine years, should be reversed on the facts, the conviction vacated and the indictment dismissed.

MAZZARELLI, J.P. (dissenting).

> "[W]eight of the evidence review requires a court first to determine whether an acquittal would not

have been unreasonable. If so, the court must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions. Based on the weight of the credible evidence, the court then decides whether the jury was justified in finding the defendant guilty beyond a reasonable doubt" (*People v Danielson*, 9 NY3d 342, 348 [2007]).

In this case, the jury's decision to convict was supported by the trial testimony. The complainant testified that she was standing very close to defendant when she allowed him and his accomplice to enter the store where she worked after closing time. She stated that she looked at defendant's face when he came in and saw it clearly. She further testified that before the robbery began, she spent time walking around the entire store with defendant, showing him and his accomplice the merchandise. She recounted that as defendant tied her up in a back room, she was looking at his face, which she could see clearly. Based on this testimony, there is no reason to question the jury's conclusion that the complainant accurately identified defendant as her assailant, notwithstanding minor discrepancies in her testimony, such as whether defendant and the other robber were wearing gloves. Certainly, on this record, this Court is in no better position than the jury to determine whether the complainant's testimony was credible, including whether the jury properly resolved inconsistencies in the testimony (*see People v Robinson*, 84 AD3d 590 [2011], *lv denied* 17 NY3d 809 [2011]).

This extends to the surveillance video, which defendant relies on as highlighting some of the complainant's inconsistencies (*see People v Funches*, 4 AD3d 206 [2004], *lv denied* 3 NY3d 640 [2004]). I note, with respect to the video, that it is of far less use to this Court than it was to the jury. The jury, after all, had the opportunity, unavailable to this Court, to compare the images of the robbers on the video to defendant, who was seated in the courtroom. This Court obviously has no basis to determine that the jury was incorrect in determining that defendant was one of the people it saw in the video (*see People v Grady*, 67 AD3d 563, 564 [2009], *lv denied* 14 NY3d 888 [2010]).

Faced with these unassailable facts, defendant now argues that the complainant was psychologically incapable of accurately identifying her assailants. This, he asserts, is because of the stress she experienced during the robbery, much of which, he

claims, must have been brought on by the fact that one of the men had a gun trained on her for part of the incident. He also asserts that the complainant's memory of her assailant must have decayed between the time of the incident and the time she spotted him on the street. In his brief, defendant cites to numerous psychology journals which discuss the current research on the stress-related fallibility of memory in the context of witness identifications. The majority also refers to such scientific theory in holding that the conviction was against the weight of the evidence.

The majority's conclusions are error. First, the complainant's testimony established that she had ample opportunity to observe her assailants before they revealed that they were in the store to rob it. The record shows that there was a significant period of time when she was looking at the perpetrators while not under the type of stress which defendant now asserts renders crime victims incapable of accurately identifying suspects.

Second, any discussion of the science of witness fallibility in the area of identification has no place in this case because there was no expert testimony concerning it. The purpose of a weight of the evidence review is to determine whether the record supported the jury's verdict. If the jurors were never presented with certain evidence, a reviewing court cannot consider it in determining whether to reverse a verdict.

This fundamental concept of appellate jurisprudence, being bound by the record before us, applies equally to scientific evidence, as it does to any other type of evidence. Where the issue in the case is not one commonly understood by laypersons, expert testimony is necessary to inform the jury. Here, the majority finds fault with the jury for not having considered the corrosive effects of event stress, exposure time, and weapon focus on a person's ability to confidently identify a perpetrator without any evidence before them on these issues. The Court of Appeals has expressly held that these scientific theories are "counterintuitive, which places them beyond the ken of the average juror" (*People v Abney*, 13 NY3d 251, 268 [2009]). Accordingly, expert testimony was indispensable in this case. Simply, there is no basis on this record for reversing the conviction as against the weight of the evidence, notwithstanding defendant's failure to introduce an expert witness.

Again, the evidence which we are required to review is comprised of the trial record only (*see People v Dukes*, 284 AD2d 236 [2001], *lv denied* 97 NY2d 681 [2001]). The trial record

contains no psychological evidence from which the jury could have inferred that the complainant's testimony that defendant was her assailant was fallible. Constrained as we are by the record evidence, which amply supports the verdict, it is simply not reasonable to conclude that the jury had an insufficient basis for finding defendant guilty. Accordingly, I respectfully dissent.

SAXE and MOSKOWITZ, JJ., concur with FREEDMAN, J.; MAZZARELLI, J.P., and MANZANET-DANIELS, J., dissent in a separate opinion by MAZZARELLI, J.P.

Judgment, Supreme Court, Bronx County, rendered January 15, 2008, reversed, on the facts, the conviction vacated, and the indictment dismissed.