■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KAHSON B., Appellant. [47 NYS3d 290]—

---

Judgment, Supreme Court, Bronx County (Analisa Torres, J.), rendered December 21, 2009, convicting defendant, after a jury trial, of assault in the second degree, adjudicating him a youthful offender, and sentencing him to a term of five years' probation, affirmed.

The verdict was not against the weight of the evidence (*see People v Danielson*, 9 NY3d 342, 348-349 [2007]). The complainant identified defendant in photo and lineup identification procedures that were properly conducted. We reject the dissent's contention that we should find, contrary to the jury's finding, that the complainant was unable to correctly identify defendant. We disagree with any suggestion that, based on the complainant's condition due to the assault he suffered, causing some loss of consciousness, his identification is not credible. There is nothing the dissenting justice points to in the record that would indicate that the complainant lost consciousness at the time he first saw his attacker.

In the cases cited by the dissent in which complainants' identifications were rejected and convictions reversed as a result, the reasons for completely discounting the identifications were far more compelling. In *People v Bailey* (102 AD3d 701 [2d Dept 2013]) the complainant was admittedly intoxicated, was unable to remember prominent features of the defendant's face, acknowledged that he had been looking mostly at a gun and had not had a good opportunity to look at the shooter, and, in addition, the identification took place more than two months after the crime. In *People v Russell* (99 AD3d 211 [1st Dept 2012]), there were numerous significant, and worrisome, discrepancies between the complainant's narrative and what was seen on the surveillance video, and a strong alibi defense along with a reasonable alternative explanation for why the complainant had recognized the defendant.

Those grounds for undercutting one-witness identifications are not comparable to the dizziness and loss of consciousness caused by the subject assault, and the limited nature of the complainant's two opportunities to look directly at his attacker. Our system of criminal justice relies on victims of violence identifying their attackers when they are able to do so. It would be ironic indeed if the severity of an attack and the resulting injuries were to prompt courts to treat the subsequent identification as unworthy of belief, despite the complainant's certainty. Of course, the defense is entitled to question an identification based on the complainant's compromised condi-

tion caused by the attack. However, that argument did not sway the jury here, and upon our review of the evidence at trial, it does not appear that the complainant was unable to make an identification.

Any inconsistencies in the complainant's testimony were minor, possibly due to limitations in his English skills, and did not undermine his overall credibility. Nor are grounds to upset the verdict presented by jurors' post-verdict assertions of escalating tempers, shouting, and bad conduct by jurors during deliberations (*see People v Redd*, 164 AD2d 34 [1st Dept 1990]). In addition, the verdict may not be revisited based on jurors' change of heart after the verdict was announced, when defendant cried and denied committing the crime, or based on jurors' belated realization that the crime of which they convicted defendant was a felony rather than a misdemeanor. A jury verdict may only be impeached upon a showing of improper influence (*see People v Brown*, 48 NY2d 388 [1979]), which was not established here. Concur—Friedman, J.P., Sweeny, Saxe and Kapnick, JJ.

Gesmer, J., dissents in a memorandum as follows: I respectfully dissent.

The complainant in this case was clearly the victim of a heinous, unprovoked attack. However, the trial evidence raises a reasonable doubt as to whether he reliably identified defendant as one of his attackers. Accordingly, this is one of the rare cases in which, upon exercising our unique authority to act as a second jury empowered to assess the proof independently, we should determine that the People did not prove defendant's identity beyond a reasonable doubt, and acquit him (*see People v Delamota*, 18 NY3d 107, 116-117 [2011]).

## Facts

On August 21, 2007 at around 10:00 p.m., the complainant was attacked by a group of people near East 167th Street and Sheridan Avenue, close to his home in the Bronx.

At the time of the incident, the complainant was wearing two necklaces, two gold rings, a gold watch, and a gold bracelet. He was carrying a wallet that he testified contained cash he had obtained earlier, including $450 to pay bills, in the one pocket, and $50 in a zipper compartment.[1] Although the night was dark, the complainant testified that the area was lit by store signs.

---

1. During cross-examination, the complainant testified he had spent $10 on groceries.

As he was walking, he saw a male teenager leaning against a car and speaking to a woman, and two men speaking to each other, one of whom was looking directly at him. The complainant described the man looking at him as six feet, one inch tall, with "corn rows, with the lump on the ear" and about 24 or 25 years old. He had seen him around the neighborhood about "ten to 15 times before." The complainant described the teenager leaning against the car as "slim, dark skinned with an afro," about "five six, seven," and "16, 17 or 18" years old. The complainant said he had seen the teenager in the neighborhood about four or five times. The complainant would later identify the teenager leaning against the car as defendant, and the man looking at him as the codefendant. However, the complainant testified that he had never seen the teenager and the man together before.

The complainant testified that, as he walked past the teenager, he heard him ask, "What the fuck you looking at [sic]?" The complainant turned around and the teenager asked him again, "[W]hat the fuck you looking at?" After this, the codefendant approached the complainant, told him the teenager who had spoken to him was his "little brother," and asked him, "What the fuck are you looking at him for?" The codefendant then punched the complainant in the face. The complainant felt dizzy from the punch and leaned on the hood of a nearby car for support. After this, the complainant was punched from behind his back by a man whom the complainant later claimed was defendant. Although he was punched from behind, the complainant claims to have turned around at some point to look at his attacker. The punches caused the complainant to bleed heavily.

As the assault continued, the codefendant grabbed at the complainant's necklaces, causing one to fall to the ground. The complainant reached for it, but the codefendant stepped on it. The complainant attempted to place it in his back pocket but claimed to feel that someone, although he could not say who, reached in and took it. The complainant also claims that his wallet was taken out of his back pocket by someone he could not identify. He testified at trial and in the grand jury that his bracelet and watch were taken.

The complainant testified that others joined in the attack. He claimed that one of three triplets who lived in the neighborhood punched him, although he could not recall which triplet it was. He also testified that another man asked him what was wrong, and, when the complainant asked him for help, he too punched the complainant. The complainant could feel his many

attackers kicking his body. He later said he had been in "[e]xtreme pain," and described the attack as the "worst thing [he] ever experienced." At trial, he testified that, in all, about six or seven people attacked him.

Police Officers Heilig and Zerella came upon the complainant while on patrol. Officer Heilig testified that the complainant was bleeding from his face and mouth, and appeared to be "uneasy on his feet," and "confused and frustrated." When Officer Heilig asked what happened, the complainant responded, "Help me help me," but provided no further details about the incident. Officer Heilig testified that he had trouble communicating with the complainant, which he attributed to the blood in the complainant's "nose and . . . airway," and the complainant's being "frustrated and upset."[2]

Officer Heilig called an ambulance for the complainant. Officer Zerella prepared a complaint report that stated that the complainant had been "hit repeatedly by unknown perps." At defendant's trial, Officer Zerella had no independent recollection of the events of August 21, 2007.

EMT Martell responded to the call for an ambulance. He described the complainant as communicative and was able to speak with him. He noted in an ambulance call report (ACR) that the complainant stated that he was assaulted by "four or five males." EMT Martell also noted in the ACR that the complainant complained of loss of consciousness and dizziness.[3] While examining him, EMT Martell observed that the complainant had three hematomas on the left side of his forehead and was bleeding out of his nose, which appeared deformed. EMT Martell transported the complainant to Lincoln Hospital and provided him oxygen to address his dizziness. Because EMT Martell viewed the complainant's claim that he had lost consciousness as serious, he gave Lincoln Hospital advance notice that he was bringing in a patient.

The complainant's care at Lincoln Hospital was described at trial by Dr. Philbert. Although Dr. Philbert did not see the complainant until the morning of August 22, when he authorized his discharge, he had reviewed the complainant's medical records, which were admitted into evidence. Dr. Philbert testi-

---

**2.** Officer Heilig also said that he believed English was not the complainant's first language. In fact, the complainant learned English as a child in Nigeria. He emigrated to the United States in 1990. The complainant described his English as "good" but not "perfect."

**3.** This is consistent with both the complainant's statement on cross-examination that he became "unconscious" and "zoned out" and his statement to the grand jury, brought out on cross-examination, that he "lost . . . consciousness."

fied that the complainant's diagnosis was "intercranial damage or loss of consciousness," a nasal bone fracture, nasal bleeding, and a lip abrasion. The complainant stated at the hospital that he had been assaulted by "three individuals." His medical records showed no injuries or trauma to his neck, body, or legs.

Dr. Philbert testified that the complainant's belongings were collected and placed in safekeeping at the hospital, consistent with a routine procedure for trauma patients. According to the hospital's records, the complainant entered the hospital with, among other things, a wallet containing $40, a watch, and a bracelet.

On August 23, 2007, Detective Ovalle contacted the complainant about the incident and met with him at the 44th Precinct. At defendant's trial, Detective Ovalle recalled that, at that meeting, the complainant described the codefendant as a black male around six feet tall, between 200 and 220 pounds, with cornrows or braids and "displayed skin" under his right ear.

Detective Ovalle also testified on direct that the complainant had given him a description of the man believed to be defendant, but he could not recall this description. At one point on cross-examination, Detective Ovalle testified that the description was of a black male around the same age as the codefendant. At the time of their arrests, the codefendant was 23 years old and defendant was 16 or 17. Detective Ovalle also testified that the complainant could not recall any of his other attackers.

Detective Ovalle memorialized the complainant's description of the codefendant in a DD-5, a form used by detectives to document investigations. Detective Ovalle did not include a description of defendant in the DD-5, despite his claim that the complainant had described defendant to him.

While the complainant was at the precinct, Detective Ovalle asked him to look at a set of photographs that he had assembled based on the complainant's description of the codefendant.[4] After looking at these photographs, the complainant identified the codefendant. Detective Ovalle did not ask the complainant to view a photo array in order to identify defendant.

The complainant testified at trial that he gave a description of the attacker he believed to be defendant to Detective Ovalle but he was unsure as to whether he gave this description on August 23, 2007 or some time later. At trial, he explained his

4. Detective Ovalle assembled this set of photographs using Photo Manager, which is essentially an electronic mug shot book.

confusion about the date by saying that the amount of pain he was in following the incident made it hard to remember; he also claimed that defendant's attorney confused him.

Detective Ovalle arrested the codefendant on August 28, 2007, relying largely on the complainant's identification of him. While the codefendant was at the precinct, his younger brother and defendant went to pick up his belongings. Detective Ovalle asked for identification from both young men so that he could run a background check before giving them the codefendant's property. After the two young men left, he compiled a photo array consisting of defendant and five other men. Detective Ovalle testified that he put defendant in the photo array because he believed he was a friend of the codefendant and that they lived together, although he did not explain the basis for his belief. Detective Ovalle explained that there was a "possibility [defendant and the codefendant] could have been together at the time of the crime." However, Detective Ovalle admitted that he could not say that defendant matched any description given by the complainant, because he could not remember any description the complainant had given him. Detective Ovalle did not create a photo array containing a photograph of the codefendant's brother.

Detective Ovalle contacted the complainant on August 28, 2007 and asked him to return to the 44th Precinct to view a photo array. Detective Ovalle did not ask the complainant for another description of the individual he believed to be defendant before showing him the photo array. Detective Ovalle showed the complainant the photo array, including defendant's photograph, which was in the "No. 2" position, and asked him if he "recognized anybody that robbed him." The complainant identified defendant. Detective Ovalle issued an identification card for defendant's arrest. Defendant, through an attorney, voluntarily surrendered himself on September 10, 2007, and was arrested.

On September 10, 2007, Detective Ovalle drove the complainant to 1028 Simpson Street to view a lineup. As in the photo array, defendant was in the "No. 2" position. Detective Ovalle asked the complainant if he recognized anyone, and he identified defendant.

Defendant and the codefendant were indicted on robbery and assault charges. At trial, the jury deliberated for several days and finally returned a verdict as to defendant, acquitting him

of the robbery counts but convicting him of assault in the second degree.[5]

## Analysis

The Appellate Division possesses the "exclusive statutory authority to review the weight of the evidence in criminal cases" (*People v Bleakley*, 69 NY2d 490, 492-493 [1987]; CPL 470.15 [5]). The Court of Appeals has explained: "This special power requires the court to affirmatively review the record; independently assess all of the proof; substitute its own credibility determinations for those made by the jury in an appropriate case; determine whether the verdict was factually correct; and acquit a defendant if the court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt" (*Delamota*, 18 NY3d at 116-117). Since this is a determination made on the facts, this Court's conclusion that a guilty verdict is against the weight of the evidence "results in an unreviewable order that rectifies an unjust conviction and precludes subsequent re-prosecution" (*id.* at 117; CPL 450.90 [2] [a]). Accordingly, this power allows this Court to sit, "in effect, as a second jury" (*id.*).[6]

Here, I would find that the verdict was against the weight of the evidence for three interrelated reasons: the effect of the assault on the complainant's ability to identify defendant as one of his attackers, the initial identification of defendant in a photo array that was assembled without a sound basis for including defendant's photograph, and the inconsistencies in the complainant's account of the assault.

As to the complainant's ability to identify defendant, I would find that the trial evidence supports the conclusion that his identification of defendant as one of his attackers was unreliable because of his dizziness, loss of consciousness, and stress during and after the assault. Verdicts in other one-witness identification cases have been held to be against the weight of the evidence when the complainant's ability to accurately identify the perpetrator was impaired due to intoxication (*People v Bailey*, 102 AD3d 701, 703 [2d Dept 2013]) or stress

---

5. The jury hung as to the codefendant.

6. While this unique power is in some sense broad, "[o]ur review of the . . . weight of the evidence is limited to the evidence actually introduced at trial" (*People v Dukes*, 284 AD2d 236, 236 [1st Dept 2001], *lv denied* 97 NY2d 681 [2001]). Therefore, I agree with the majority that we cannot consider either the posttrial repudiation of the verdict by some of the jurors or the trial court's statement that this Court might be inclined to intervene.

(*People v Russell*, 99 AD3d 211, 215 [1st Dept 2012]).[7] This is consistent with the standard jury instruction, given in this case, that juries in one-witness prosecutions must consider "the mental, physical, and emotional state of the witness before, during, and after the observation" (CJI2d[NY] Identification-One Witness).

In this case, the complainant only claimed to have had two opportunities to observe the attacker he believed was defendant. The first opportunity came when the complainant turned around after this attacker asked for a second time why he was looking at him. The second opportunity came when the complainant turned around after being punched from behind by this attacker. The first opportunity immediately preceded, and he second opportunity immediately followed, the codefendant's punch, which made the complainant so dizzy that he had to lean on a car for support. In addition to being dizzied, the complainant also lost consciousness, a fact that appears several times in the record: in the complainant's testimony on cross-examination, in prior grand jury testimony brought out on cross-examination, in EMT Martell's ACR, and in the testimony of the People's medical expert, Dr. Philbert.

The complainant described the incident as the "worst" thing he had ever experienced. Officer Heilig, the first witness to interact with the complainant following the assault, described him as acting erratically.

Accordingly, the complainant's mental, physical, and emotional state during and after his observation of this attacker supports the conclusion that the circumstances of the assault "negatively affect[ed] the reliability of his identification of . . . defendant" (*Bailey*, 102 AD3d at 703). While the majority highlights that the trial jury did not find this way, our weight of the evidence review empowers us to perform a "de novo review of the evidence." (*People v Diaz*, 115 AD3d 498, 500 [1st Dept 2014]). Thus, we are not tethered to the jury's interpretation of the facts. Particularly in a case such as this one, which presents a significant issue of identification, our careful reexamination of the proof is important to ensuring that de-

---

**7.** I cite these cases to illustrate that both this Court and the Second Department have considered various ways in which a complainant's perception could be adversely affected, in the context of determining whether a verdict was against the weight of the evidence in a one-witness identification case. I do not disagree with the majority that the facts of those cases differ in several respects from this case. However, in this case, as in *Bailey* and *Russell*, there are additional sources of doubt in the record, besides the complainant's impaired perception, that lead me to the conclusion that the verdict was against the weight of the evidence.

fendant was not wrongfully convicted. As the Court of Appeals has stated: "We are concerned, of course, about the incidence of wrongful convictions and the prevalence with which they have been discovered in recent years. The unfortunate fact is that juries occasionally do not return proper verdicts. An important judicial bulwark against an improper criminal conviction is . . . the protection provided by weight of the evidence examination in an intermediate appellate court" (*Delamota*, 18 NY3d at 116). I agree with the majority that the testimony of complainants who suffer serious injuries should be given careful and thoughtful attention by our criminal courts. However, under the unique facts of this case, and when considered alongside the other sources of doubt in the record, the complainant's dizziness, loss of consciousness, and stress suggest that he misidentified defendant as one of his attackers.

Next, the complainant's initial identification of defendant occurred in a photo array in which Detective Ovalle included defendant's photograph without any sound basis for doing so. Detective Ovalle conceded that he could not say that defendant matched any description he had been given by the complainant. Indeed, Detective Ovalle did not recall any description of defendant by the complainant, and at one point claimed that the complainant had described him inaccurately as being the same age as the codefendant. Detective Ovalle's paperwork contained no contemporaneous or close-in-time memorialized description of defendant by the complainant, which is in striking contrast to the complainant's contemporaneously recorded descriptions of the codefendant.[8]

Instead, Detective Ovalle included defendant in a photo array based only on his accompanying the codefendant's brother to the precinct to pick up the codefendant's belongings. If anything, this should have suggested that defendant was not one of the complainant's attackers. If defendant were the codefendant's accomplice, it would be extremely unlikely that he would travel to the precinct where the codefendant was being held and then give his identification to a detective when asked.

---

**8.** Creating a photo array in the absence of a contemporaneous description of the assailant runs afoul of the Court of Appeals' statement that "[c]omparison of the verbal description—made on the basis of recollection alone, close to the time of the crime—with the actual features of the person later . . . identified can assist the jury in evaluating the degree to which the later . . . identification may or may not have been the product of intervening memory failure" (*People v Huertas*, 75 NY2d 487, 493 [1990]). Here, the sparse and inconsistent evidence about the complainant's purported close-in-time description of defendant hinders this Court's ability to make the comparison endorsed by *Huertas*.

Accordingly, a finding that the verdict is against the weight of the evidence is also supported by the lack of a sound basis for the photo array in which the complainant first identified defendant (*cf. Bailey*, 102 AD3d at 703 [finding verdict against the weight of the evidence when, among other issues, lineup evidence was undermined by a two-month delay following the time of the incident]).[9]

Finally, I would find the verdict against the weight of the evidence based on the complainant's inconsistencies in describing several details of the assault.

First, the complainant was inconsistent in describing the number of his attackers. He told Police Officer Zerella that he was attacked by an unspecified number of attackers. He told EMT Martell that he was attacked by four or five people. He told Lincoln Hospital staff that he had been attacked by three people. At trial in 2009, he testified that he was assaulted by six or seven people.

Second, the complainant testified that he was kicked "all over," and felt "extreme pain." This was inconsistent with Dr. Philbert's testimony that there was no trauma or visible injury to his body or legs.

Third, the complainant testified at trial and in the grand jury that his attackers stole his watch and bracelet. His medical records established that he entered Lincoln Hospital with both the watch and the bracelet in his possession.

Fourth, the complainant claimed that his attackers took his wallet, which contained close to $500. His medical records established that, when he entered Lincoln Hospital, his wallet contained $40. It seems implausible that his attackers took his wallet, removed some money from it, and then returned the wallet to the complainant before fleeing.

Fifth, Detective Ovalle testified that the complainant could not remember anything about his attackers, other than defendant and the codefendant. However, the complainant testified that one of his assailants, other than defendant and the codefendant, was one of three triplets who lived in his neighborhood.

---

9. The motion court's denial of the motion to suppress does not bar us from looking carefully at the photo array. Presumably, in *Bailey*, the lineup evidence had also survived a pretrial suppression hearing. Even though the photo array in this case was found to be properly conducted, "suggestiveness is only one of the possible sources of [identification] mistakes. A witness to whom no one has made any suggestion can be mistaken for any one or more of many reasons" (*People v Marte*, 12 NY3d 583, 589 [2009], *cert denied* 559 US 941 [2010]).

I disagree with the majority's view that these inconsistencies are minor. When considered with the other evidence in the record, the complainant's inability to accurately recall details of the incident buttresses the doubts surrounding his identification of defendant. In other one-witness identification cases, this Court has held that the complainant's inconsistencies supported a finding that the verdict was against the weight of the evidence when combined with the record's other sources of doubt (*see Diaz*, 115 AD3d at 499-500 ["Although they are not as significant, the complainant demonstrated other lapses in memory which, when considered in light of those two more substantial inconsistencies, lead us . . . to harbor significant doubts as to the complainant's ability to accurately identify his attacker"]; *see also Russell*, 99 AD3d at 211 ["While no one factor in this case mandates reversal, the combination of factors . . . (is) sufficient to warrant reversal based on the weight of the evidence"]).

I also disagree with the majority's implication that these inconsistencies should be discounted as the byproduct of a language barrier. The complainant testified that he learned English at a young age in Nigeria. He had been living in the United States more than 15 years at the time of the incident. Only Officer Heilig found the complainant hard to communicate with, and he attributed it to the complainant's stress and the amount of blood in his "nose and . . . airway." At trial, the complainant demonstrated an ability to express himself in English and, when he was asked questions he did not understand, he requested clarification. In all, the record does not suggest that his English skills were so poor that these inconsistencies flowed from a language barrier.

Accordingly, I would find that the trial evidence lacked "proof that leaves [one] so firmly convinced of the defendant's guilt that [there is] no reasonable doubt . . . of the defendant's identity as the person who committed the crime" (CJI2d[NY] Reasonable Doubt). I would therefore reverse the judgment and dismiss the indictment.